

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0943-11

**MEGAN WINFREY, A.K.A. MEGAN WINFREY HAMMOND, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE NINTH COURT OF APPEALS
## SAN JACINTO COUNTY

JOHNSON, J., delivered the opinion of the Court in which PRICE, WOMACK, KEASLER, HERVEY, COCHRAN, and ALCALÁ, JJ., joined. KELLER, P.J., filed a dissenting opinion. MEYERS, J., dissented.

## O P I N I O N

In August 2004, Murray Burr, a man who worked at the local high school that appellant attended, was found dead in his home with numerous stab wounds and multiple sharp- and blunt-force injuries. Appellant was sixteen years old in 2004. In 2007, after an investigation that included dog-scent lineups, appellant and her father and brother were taken into custody and charged with the murder. Her indictment contained two counts: capital murder during the course of robbery and conspiracy to commit capital murder. Her father and brother were named as co-conspirators in the

conspiracy count. A jury convicted appellant of both counts. The trial court sentenced appellant to life imprisonment for the capital-murder count and forty-five years' imprisonment for the conspiracy count. The court of appeals affirmed the convictions, with one justice dissenting. *Megan Winfrey v. State*, 338 S.W.3d 687, 689 (Tex. App.–Beaumont 2011).[1] We reverse the judgment of the court of appeals and render acquittals on both counts.

**Facts**

In August 2004, Murray Wayne Burr was found murdered in his home. Evidence at trial indicated that the victim had been stabbed or cut twenty-five times in the head and neck area and three times in the torso and had also received multiple blunt-force trauma that produced a broken right jaw and eye orbit. No other injuries were noted by the assistant medical examiner.

There was no evidence of forced entry into the victim's home. A blood trail indicated that the victim had been dragged from his living room into his bedroom, where his body was found, but there was no indication of a violent struggle. Shortly after the murder, family members reported that the only item that they thought was missing from the victim's home was a Bible. His wallet was in the house, and except for the blood and the body, nothing in the home appeared to be disturbed. Some time later, a relative said that he thought that two guns were missing.

Investigators collected hair, blood and DNA samples, a bloody footprint, and fingerprints from various places in the house and a DNA swab from women's underwear that was found in Burr's bedroom. They also took a casting of a footprint in the front yard. Hair samples recovered

---

[1] Appellant's father, also accused of this capital murder, was convicted of the lesser-included offense of murder. His conviction was affirmed by the court of appeals but, on discretionary review, we reversed his conviction and entered a judgment of acquittal. *Id*. at 885. A jury acquitted appellant's brother of this same capital murder and conspiracy. *Richard Winfrey v. State*, 323 S.W.3d 875, 876, n.1 (Tex. Crim. App. 2010).

from Burr's body contained a partial female DNA profile. The DNA profiles that were developed from the collected items either matched the victim or did not match any of at least nine individuals who were questioned in regard to the murder. No physical evidence connected appellant or her family to the scene, nor were she or any member of her family connected to the property assumed to be missing from Burr's home. *Megan Winfrey v. State*, 338 S.W.3d at 689. The only evidence that purported to directly connect appellant to the crime scene was a "scent lineup" conducted by Keith Pikett.

At appellant's trial, before Deputy Pikett testified, Ranger Grover Huff testified that he had witnessed the scent lineup for appellant's scent samples. He noted that the grass was too high to see the cans on the video of the lineup and that Deputy Pikett "is having me reposition the cans. She [the bloodhound] doesn't react. The wind had switched or something. You could tell by the way the grass was."

Deputy Pikett testified that, at the 2007 dog-scent lineups, the two dogs both alerted on appellant's scent sample.[2] Pikett indicated that the dog alerts reflected that the dogs alerted to her scent being on Burr's clothes, indicating that appellant had had contact with Burr's clothing.[3]

In August of 2004, appellant voluntarily consented to an interview with a Texas Ranger who was investigating this murder and voluntarily provided buccal swabs, scent pads, and fingerprints to him. In August of 2006, pursuant to a court order, a deputy sheriff attempted to obtain a pubic-

---

[2] An "alert" occurs when the dog matches a scent collected from the victim to the suspect's scent pad. *Richard Winfrey v. State*, 323 S.W.3d at 877, n.3. In this case, Deputy Pikett indicated that the dogs alert in different manners. E.g.,"James Bond is going to turn 90 degrees if he finds the right can[,]" while "Quincy is going to turn sideways and bark, and Clue is going to turn and jump on [Pikett]." V R.R. 74. But ultimately Pikett makes the decision as to whether a dog has alerted. V R.R. 75-76.

[3] We note that the time at which a scent was left on an item cannot be determined.

hair sample from appellant, but it was determined that she had shaved that morning; the deputy did obtain such a sample thirty days later. The deputy testified that appellant voluntarily consented when the second request was made.

Appellant's ex-boyfriend, Jason King, who had dated her for six months after the murder, testified that appellant had received information that a search warrant was going to be conducted for her pubic hair and that she then shaved herself. King also testified that, after the shaving incident, when appellant received a phone call informing her that her brother had been arrested, she went to see her ex-husband, Hammond, and spoke with him about having attended a concert together around the time of the murder. "King understood the conversation as an attempt to establish an alibi."[4] *Megan Winfrey*, 338 S.W.3d at 695. King also related that, while they were "partying and drinking," appellant had told him that going into Burr's home "was an easy lick," which he took to mean she would get money.

Karen Robertson, a teacher or teacher's assistant from appellant's high school,[5] testified that, in the summer of 2004, she saw appellant approach Burr at school and ask him, "When are you going to take me out and spend that money that you have? We know you have that money hid [sic] at home." In the state's rebuttal, another teacher testified to overhearing appellant refer to Burr and say, "Somebody should beat the shit out of him," although that teacher acknowledged that appellant then apologized to the teacher and said she did not mean to have said that aloud and that she lived near Burr and "was just tired of all his cats." Other evidence showed, and appellant conceded, that on

---

[4] It was established at trial that the concert that appellant and Hammond attended was on the day the victim's body was discovered. Appellant did not raise the concert as an alibi.

[5] At the time of trial, Robertson was employed as the Crime Victim Assistant Coordinator for the local district attorney's office.

occasion she and her brother visited Burr at his home, which was near their residence, on their way to church. She also testified that the Winfreys sometimes asked the victim to go to church with them, but that he would decline.

On direct appeal, appellant claimed that the evidence was legally and factually insufficient to establish that she had committed the capital murder or the conspiracy to commit capital murder and alternatively, that, based upon our holding in *Richard Winfrey v. State*, 323 S.W.3d 875, 876-78 (Tex. Crim. App. 2010),[6] the evidence was insufficient to establish that she had committed those two offenses.

In reviewing the sufficiency of the evidence to support the convictions, the court of appeals set aside the dog-scent lineup evidence because such evidence was insufficient to establish appellant's guilt beyond a reasonable doubt. *Megan Winfrey*, 338 S.W.3d at 694. After reviewing all of the other evidence, including evidence at the crime scene, appellant's statements and conduct, and an informant-inmate's testimony about appellant's father's purported statements while incarcerated nearly two years after the murder, the court of appeals determined that the evidence supports the jury's decision and thus affirmed the judgment. *Id., passim*. The court of appeals also held that, with regard to appellant's conspiracy conviction, the fact that appellant's alleged co-conspirators (her father and her brother) were either acquitted of, or not charged with, conspiracy did not bar her from being convicted of the conspiracy. *Id.* at 698-99.

**Capital Murder**

We granted review of appellant's two grounds. Her first ground challenges the capital-

---

[6] The evidence was insufficient to support the murder conviction of appellant's father for killing the same named victim that appellant was convicted of killing and conspiring to kill. *Id*.

murder conviction and asserts that the court of appeals's holding that the evidence was legally sufficient to sustain that conviction conflicts with this Court's decision in *Richard Winfrey v. State*, 323 S.W.3d 875, "with respect to the same evidence and with this Court's decision in *Brooks v. State*, [323 S.W.3d 893 (Tex. Crim. App. 2010)], which requires rigorous and proper application of *Jackson v. Virginia*'s exacting standards." Her second ground challenges the conspiracy conviction and questions "the court of appeals'[s] holding, contrary to the dictates of §15.02(c)(2), Texas Penal Code, that a conviction for conspiracy can be sustained even though the only other conspirators have been acquitted."

Appellant asserts that, unless the canine scent lineup is treated as primary evidence, "there is no evidence which implicates appellant in this murder either directly or by application of the law of parties." She argues that the majority opinion of the court of appeals conflicts with our decision in *Richard Winfrey*, 323 S.W.3d 875, *supra*. Appellant contends that "[i]t is inconceivable that the jury did not convict on the basis of the scent lineups[,]" regardless of the court of appeals's attempt to analyze the evidence wholly without regard to the dog-scent lineup. She argues that the dog-scent lineup evidence "is not sufficiently reliable to be accorded any weight, even a supporting role."

"[W]hen conducting a legal sufficiency review, this Court considers all evidence in the record of the trial, whether it was admissible or inadmissible." *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). *See also Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) ("When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper."); *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006) ("[A] reviewing court is permitted to consider all evidence in the trial-court record, whether admissible or inadmissible, when making a legal-sufficiency determination."). Thus, regardless of whether the dog-scent lineup

evidence was properly admitted, such evidence is properly considered in a review of the sufficiency of the evidence.

The court of appeals specifically stated that "the dog-scent lineup evidence is insufficient to establish [appellant]'s guilt beyond a reasonable doubt, and we set it aside from our sufficiency review"[7] and thus did not consider the dog-scent lineup evidence in its review of the sufficiency of the evidence. In its brief on discretionary review, the state does not assert that the court of appeals erred in doing so. We do observe that the dog-scent lineup evidence, with the dog alerting to appellant's scent on Burr's clothing, simply indicates that appellant had had some contact with Burr's clothing, although the timing, circumstances, and degree of that contact cannot be determined.

We apply *Jackson v. Virginia*, 443 U.S. 307 (1979), as the standard for reviewing the sufficiency of evidence. "In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011), *citing Jackson v. Virginia*, 443 U.S. at 318-19. In *Brooks, supra*, we also determined that, when viewing the evidence in the light most favorable to the verdict, "the reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899, *citing Jackson, supra* at 319 and 326. The court of appeals properly noted that standard and that "[i]t is unnecessary for every fact to point directly and independently to the guilt of the accused; it is enough if the finding of guilt is warranted by the

---

[7] *Megan Winfrey*, 338 S.W.3d at 694.

cumulative force of all the incriminating evidence." *Megan Winfrey*, 338 S.W.3d at 694, *citing Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

In *Richard Winfrey*, *supra*, we discussed evidence that involves use of canines to differentiate among human scents in order to identify a specific person in a lineup, i.e. human-scent discrimination. We ultimately held that, "when inculpatory evidence is obtained from a dog-scent lineup, its role in the courtroom is merely supportive." *Id.* at 884. We concluded that dog-scent lineups, "when used alone or as primary evidence, are legally insufficient to support a conviction." *Id*. While a dog-scent lineup might have raised a "strong suspicion" of appellant's father's guilt, standing alone it was insufficient to establish his guilt beyond a reasonable doubt. *Id*. at 885. Appellant argues that this dog-scent lineup evidence is even less incriminatory of her, while the state points to multiple evidentiary facts which it insists are sufficiently incriminatory, above and beyond the dog-scent lineup evidence. Thus we must review these additional evidentiary facts to determine whether they are sufficient to prove appellant's guilt.

Appellant asserts that the principle evidence cited by the court of appeals–her ex-boyfriend's testimony that she called Burr an "easy lick," and the jailhouse informant's testimony that her father told him that one of his kids was supposed to let him into Burr's house–does not implicate her in this crime, nor does it place her at the scene at or near the time of the murder: She contends that, when "[v]iewed outside the tainted prism of the dog-scent evidence, these two pieces of weak circumstantial evidence do not support a reasonable inference that appellant was involved in the murder, knowledgeable about the murder, or even present at the time of the crime." Appellant also asserts that there was no testimony presented at trial that implicated her in the murder, there was no physical evidence that connected her to the crime scene or Burr, but there was physical evidence,

including DNA, hair, and a footprint in Burr's blood, that did not match her or her family members and for which the source could not be identified. She suggests that nearly all of the evidence was of the sort that she would have introduced, had the state not done so.

Appellant acknowledges testimony that one of her teachers heard her say to Burr that she knew he had money hidden at his home, but she notes that there was no evidence that money was taken from Burr's home and points out that Burr's wallet was still at the residence, atop the washing machine. She also discounts the state's efforts to imply that there was money in Burr's missing Bible.

Appellant also questions the incriminating nature and sufficiency of testimony that her ex-boyfriend had heard her discuss with her ex-husband whether they were at a concert the night of the murder. She asserts that such a discussion establishes nothing more than investigation of a possible alibi, for which any prudent person, upon learning of the possibility of being criminally charged, would search his memory, and that of close friends and relatives, in order to determine his whereabouts at the time a crime occurred and discover any witnesses who could support an alibi. Echoing the court of appeals's dissenting opinion, she suggests that "this was not in any sense evidence of the creation of a *false* alibi." Appellant's brief at 38.

Appellant questions the nature of the ex-boyfriend's testimony that she shaved her pubic area after having learned that a search warrant had been issued to obtain a sample of her pubic hair. She points out that the boyfriend never claimed that she had not shaved that area previously, and the undisputed facts show that she cooperated in the investigation "by voluntarily submitting to an interview, and by providing scent exemplars, buccal swabs, and fingerprints[,]" and that she subsequently provided the pubic-hair sample. Appellant's brief at 38. Appellant also suggests that,

in light of her unchallenged testimony that she ordinarily shaved her pubic area, her ultimate provision of the pubic-hair sample, and her earlier full cooperation in providing other samples that would have been used to determine whether any of the forensic evidence from the crime scene connected her to it–the same purpose as the pubic-hair sample–any speculation or conjecture predicated upon her ex-boyfriend's testimony about the timing of the shaving "seems faint indeed."

Appellant challenges the testimony of another of her teachers that she clenched her fist and said that somebody should "beat the shit out of" Burr, purportedly because she was mad about his cats. She notes evidence indicating that she subsequently had friendly dealings with Burr and suggests that, without context or timing, the incident described by this teacher warrants little weight, even in an analysis that views the evidence in the light most favorable to the verdict.

Appellant asserts that none of the circumstantial evidence, separately or cumulatively, rise to a level beyond mere speculation and that "a criminal conviction may not properly rest upon speculation and conjecture." She argues that "[t]he dog-scent lineups–represented to the jury as scientifically authentic and essentially infallible–explain the verdicts here" and suggests that "[t]hose verdicts do not comport with due process and should be set aside."

The state acknowledges that "review of the evidence in this case begins with a strong suspicion of [her] guilt." State's brief at 14. Yet a strong suspicion of guilt does not equate with legally sufficient evidence of guilt. In discussing our opinion in the appeal of the conviction of appellant's father, the state focuses upon whether the dog-scent evidence is corroborated, insists that there is ample corroboration, and notes six items of corroborating evidence that it argues "connect [appellant] directly to this brutal murder." Yet in *Richard Winfrey, supra*, while acknowledging that we, like the Supreme Court of Washington, "believe that '[t]he dangers inherent in the use of dog

tracking evidence can only be alleviated by the presence of corroborating evidence,'"[8] we simply held that "when that inculpatory evidence is obtained from a dog-scent lineup, its role in the courtroom is merely supportive." *Richard Winfrey v. State*, 323 S.W.3d at 884 (quoting *State v. Loucks*, 98 Wash.2d 563, 567, 656 P.2d 480, 482 (1983)). We specifically held "scent-discrimination lineups . . . to be separate and distinct from dog-scent tracking evidence." *Id*. at 883. We did not say that such dog-scent lineup evidence must be corroborated to be legally sufficient evidence of guilt, but rather that such evidence "is merely supportive" of the remainder of the evidence. As merely supportive evidence, dog-scent lineup evidence cannot itself constitute sufficient evidence of guilt. The state acknowledges that the "issue of the admissibility of the dog scent evidence was settled in her father's case and need not be reargued here." State's brief at 28. The state also recognizes that "[t]he same dog scent evidence is present in this case." State's brief at 14. Appellant acknowledges that "[i]n this case, no objection was made to the dog scent evidence." Appellant's brief at 22.

The state compares its suggestion of evidence corroborating the dog-scent evidence with the statutory requirement of Texas Code of Criminal Procedure art. 38.14 that "[a] conviction may not be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." "This rule is a 'statutorily imposed review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008), *quoting*

---

[8] We note that dog-tracking is the activity performed by tracking dogs such as bloodhounds, often when searching for persons who are missing or thought to be involved in a criminal act. In those circumstances, the dog is given a scent, and it then follows that scent, with humans following where the dog leads. Dog-scent lineups are activities performed by humans who use tracking dogs to match a known scent sample to an unknown scent sample.

*Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007); *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001) ("The accomplice-witness rule is not based upon federal or state constitutional notions of sufficiency."). We do not use the accomplice-witness rule in evaluating the sufficiency of evidence, including evidence derived from a dog-scent lineup. We simply review all of the evidence in the light most favorable to the verdict, and the dog-scent lineup evidence "is merely supportive" of the remainder of the evidence.[9]

In reviewing all of the evidence in the requisite light, we include the six items of corroborating evidence that the state asserts connect appellant directly to the instant murder. These six items include: 1) testimony that appellant believed that Burr had money in his home, and she wanted it; 2) appellant's father's jail cell-mate, Campbell, testified that appellant's father related specific information about the murder, including that the father's children had let the father into the house, that Burr had been stabbed repeatedly, and that guns had been stolen from the house, whereupon law-enforcement officials, who had not known that guns were missing, then talked to Burr's relatives and confirmed that guns were missing; 3) when appellant heard that her brother had been arrested for the murder, she asked her boyfriend to take her to her ex-husband's house, allegedly to discuss their daughter, but instead discussed only a possible alibi for the night of the murder; 4) after her ex-husband was subpoenaed, appellant called his mother to find out if he was going to testify; 5) when she learned that law-enforcement personnel had found a pubic hair at the crime scene, appellant shaved herself, allegedly to prevent the taking of a sample of her pubic hair;

---

[9] We again note that, since the court of appeals did not consider the dog-scent lineup evidence in its review of the sufficiency of the evidence–it "set it aside from [its] sufficiency review"–and the state has not asserted that the court of appeals erred in doing so, we do not consider the propriety of setting aside such evidence in reviewing the sufficiency of the evidence.

and 6) appellant told her boyfriend that she went to Burr's house because "it was an easy lick," which the boyfriend construed to mean appellant thought she would get money.

The state also points to testimony that there was a drop of blood underneath and a drop on top of the overturned vacuum cleaner in the closet and suggests that this allowed the trier of fact to "draw the inference that these drops and their positioning could have occurred when the murderer was in the closet taking the guns and looking for items to steal."[10]

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). While juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial, "juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Id*. at 15. "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them," while "[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id*. at 16. "A conclusion reached by speculation . . . is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id*.

The circumstantial evidence that the state presents as indicia of appellant's guilt of the capital-murder offense appears more speculative than inferential as to appellant's guilt. Campbell testified that appellant's father told him that just one of his children allowed him to gain access to Burr's house but did not say which one, nor did he indicate the time, circumstances, or manner in which access to the house was gained. Campbell also testified that he did not know appellant, had

---

[10] DNA from the blood did not link any of the Winfreys to the murder scene, nor was there any evidence that connected any of them to the missing guns.

never met her, that everything he was being asked was "hearsay to this trial[,]" and that he did not "feel right today testifying against her." When pressed by defense counsel, Campbell conceded that he "got the impression" that appellant's father was present during the murder, but stated, "Everything that I am saying today is hearsay . . .." Campbell also indicated that appellant's father's main concern was that his kids were being framed for the murder and that he could not understand why they were going after his kids. While Campbell's testimony in this trial appears somewhat incriminatory as to appellant's father, that testimony does not specifically inculpate appellant. Perhaps most tellingly, Campbell repeatedly asserted that, not only had appellant's father told him things that only someone who had been present at the murder would know, but that he contacted law enforcement only after appellant's father described how the victim's penis had been cut off and "crammed into" the victim's mouth. If that claim had been fact, it surely would have been noted by the medical examiner, but was not; all injuries were to the victim's head, neck, back and left arm.

The evidence of appellant's shaving of her pubic hair seems much less significant in light of her unchallenged testimony that she regularly shaved it, her later provision of the requested sample, and the determination that her hair did not match a hair recovered from the scene. With regard to appellant speaking with her ex-husband about having attended a concert around the time of the murder, we do not perceive any indicia of guilt from simply discussing a possible alibi for the time of the murder; alibi is a legitimate non-statutory defense. We also fail to discern any particular incrimination in appellant contacting her ex-husband's mother to determine whether he was going to testify at trial. Appellant's expression of knowledge that Burr had money in his home that she wanted and that she went to his house because "it was an easy lick" does not reveal any action on her part to actually kill Burr and take his money, and it is even less incriminatory when we consider

that the police investigation was unable to determine that any money had been taken from Burr during the course of the murder.[11] The state's suggestion of an appropriate inference[12] drawn from blood drops on the vacuum cleaner supports no connection to appellant at all because the DNA of those blood drops did not match any of the Winfreys.

The record reflects that, in 2006, law enforcement contacted Burr's family about the possibility that guns may have been taken. Burr's brother-in-law, who had seen the guns in Burr's possession several months before the murder and, approximately three to five months before the murder, had seen one in Burr's home, confirmed that, after the murder the guns were not in Burr's home and have never been located. However, there was no evidence indicating when and under what circumstances the gun or guns were removed from Burr's home, no evidence that appellant had any involvement with the removal of the gun or guns from the home, or that the guns were removed during the course of the murder. Burr's sister testified that, when she walked through the house after the murder, she noted that Burr's Bible was missing. Her testimony does not in any way implicate appellant in the removal of the Bible from Burr's home or prove that there had been money hidden in it.

Basing a finding of appellant's guilt on this evidence and all of the other evidence is, at best, "mere theorizing or guessing" about appellant's possible guilt rather than a reasonable inference based upon evidence and facts presented. "A conclusion reached by speculation . . . is not

---

[11] When asked at trial if she understood Burr to have a lot of money, appellant stated, "No. He was a janitor."

[12] The state suggests that the blood drops allowed the trier of fact to "draw the inference that these drops and their positioning could have occurred when the murderer was in the closet taking the guns and looking for items to steal." That inference may very well be an appropriate one, but it, without a DNA or other connection to appellant, does not implicate her.

sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d at 16. After reviewing all of the evidence in the light most favorable to the guilty verdict, we hold that the evidence merely raises a suspicion of appellant's guilt and is legally insufficient to support a conviction of capital murder beyond a reasonable doubt. Accordingly we sustain appellant's first ground for review.

### Conspiracy to Commit Capital Murder

On direct appeal, appellant argued that the evidence was insufficient to establish that she had committed conspiracy to commit capital murder. In this Court, appellant notes "that the conduct at issue is an agreement. It is the agreement that defines conspiracy."[13] Alternatively, she asserts that § 15.02(c)(2) does not permit conviction for conspiracy when the only other conspirators have been acquitted and that the contrary holding by the court of appeals constitutes fundamental error.[14]

The state asserts that § 15.02(c)(2) was construed correctly. It notes that two people have not been acquitted, as the statute requires and argues that appellant is attempting to circumvent the first element of the statute, § 15.02(c)(1)–that it is no defense to prosecution for criminal conspiracy that "one or more of the coconspirators is not criminally responsible for the object offense[.]"[15]

---

[13] Section 15.02(a) provides that a person commits criminal conspiracy if, with intent that a felony be committed, 1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and 2) he or one or more of them performs an overt act in pursuance of the agreement. TEX. PENAL CODE § 15.02(a).

[14] Section 15.02(c)(2) provides, "It is no defense to prosecution for criminal conspiracy that: . . . (2) one or more of the conspirators has been acquitted, so long as two or more coconspirators have not been acquitted." Presumably, "two" includes the person on trial. Without such a presumption, a conspiracy between only two persons could result in one person being acquitted and the other convicted, resulting in a conspiracy of one. Such a result is barred. *Barber v. State*, 764 S.W.2d 232, 234 (Tex. Crim. App. 1988) (In a § 15.02 criminal-conspiracy prosecution, "[o]ne person acting alone cannot commit conspiracy.").

[15] We observe that the state's briefing on this issue consists of one page of conclusory statements and addresses only the meaning of the statute. The only supporting authority is a citation to a 2010 opinion from the Texas Supreme Court that holds that "[p]lain meaning is the dominant factor in applying a statute." The state sets

We find that we do not need to address the proper interpretation of the statute in this case because the record does not contain evidence on which a reasonable jury could find that appellant agreed with one or both of the alleged co-conspirators that one or more of them would engage in conduct that would constitute the alleged capital murder or that one or more of them performed an overt act in pursuance of such an agreement. Appellant addressed and argued the issue of agreement in her brief to the court of appeals: "The State could not produce a single witness that was able to produce any evidence [that] Appellant agreed with anyone to murder Murray Burr in the course of a robbery." Appellant's brief on appeal at 33. The state responded in its brief: "The agreement to commit the crime may be inferred from the acts of the parties." State's brief on appeal at 30. And, although the majority opinion did not explicitly address the agreement element, the dissenting opinion in the court of appeals noted that the issue had been raised and, implicitly, overruled by the majority: "A person commits the offense of conspiracy if, with intent that a felony be committed, she agrees with one or more persons to engage in conduct that would constitute the offense, and she performs an overt act in pursuance of the agreement. Tex. Penal Code Ann. § 15.02(a) (West 2003). . . . Moreover, there was no evidence, other than the scent lineup evidence, from which an agreement between Winfrey and her brother or father to commit the crime could be inferred." *Megan Winfrey*, at 708-09 (Kreger, J., dissenting). Because the issue was raised (and rejected) in the court below, it is properly before this Court.[16]

---

out no evidence of an agreement, and we find none in the record.

[16] *See, e.g., Benavidez v. State*, 323 S.W.3d 179, 183 & n.20 (Tex. Crim. App. 2010) (in its discretionary-review capacity, this Court reviews "decisions" of the courts of appeals; an issue that the lower court did not pass upon is not ordinarily ripe for our review).

Regardless of whether the acquittal of appellant's brother of conspiracy, combined with her father's acquittal of the murder and the state's election not to indict him for conspiracy, constituted a defense to the prosecution for the criminal conspiracy, the evidence in the record is insufficient to sustain the agreement element of the conspiracy statute. Appellant is thus entitled to the requested relief regarding her criminal-conspiracy conviction.

We reverse the judgment of the court of appeals and render a judgment of acquittal for each offense. *Burks v. United States*, 437 U.S. 1, 18 (1978) (which required the remedy of appellate acquittal on grounds of evidentiary insufficiency).


Delivered: February 27, 2013
Publish