**Opinion filed August 15, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00243-CR

_____

## ALBERT MENDEZ, JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 32nd District Court**

**Nolan County, Texas**

**Trial Court Cause No. 10987**

## M E M O R A N D U M   O P I N I O N

The jury convicted Albert Mendez, Jr., Appellant, of the offense of indecency with a child by contact and assessed his punishment at confinement for eighteen years and a fine of $10,000. We affirm.

In his sole issue on appeal, Appellant challenges the sufficiency of the evidence to support his conviction. We review a challenge to the sufficiency of the

evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Appellant suggests that, to properly apply the *Jackson* standard, appellate courts should "evaluate[] the weight and credibility of all of the evidence." However, controlling precedent provides that a reviewing court is required to defer to the jury's determinations regarding the weight and credibility because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899 (citing *Jackson*, 443 U.S. at 319, 326); *see* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979) (jury, as the trier of fact, is the sole judge of the credibility of the witnesses and of the weight to be given to their testimony).

Appellant was convicted of intentionally or knowingly engaging in sexual contact with his stepdaughter, B.J., a child under the age of seventeen years, by touching her genitals. *See* TEX. PENAL CODE ANN. § 21.11 (West 2011). The record shows that police were dispatched to Appellant's home around 2:00 a.m. in response to a call that a child "had just been molested." Sergeant Matt Counts arrived at the house and spoke to M.A.M., who was Appellant's wife and B.J.'s mother. M.A.M. was crying; she was very upset. M.A.M. reported that she first saw Appellant standing over her oldest daughter, B.J., with his pants unbuttoned and then observed Appellant and B.J. lying on the couch—with B.J. on top of

Appellant—covered with a blanket. According to Sergeant Counts, M.A.M. said that she told B.J. to get back on the other couch and that, when B.J. complied, M.A.M. noticed that B.J. did not have her panties on and that Appellant was under the blanket making movements like he was trying to pull his pants up. M.A.M. told Sergeant Counts that she noticed B.J.'s panties lying on the floor and told B.J. to put her panties back on. M.A.M. called the police.

Sergeant Counts arranged for B.J., who had been crying as she sat on the couch wrapped in a blanket, to be taken to the emergency room for a SANE exam. Appellant was taken to jail. According to Sergeant Counts, Appellant appeared to have been drinking heavily that night.

Pat Rollins, a registered nurse and sexual assault nurse examiner, performed the SANE exam on B.J. During the exam, Rollins observed some redness from the mid-perineum area up to the labia. Rollins testified that that area should not have been red. Rollins included B.J.'s panties in the rape kit.

Testing conducted by Naomi McDonald, a Department of Public Safety forensic scientist, revealed no sperm or semen, but it did reveal that B.J.'s panties had a mixture of DNA. The major component in the DNA profile was B.J.'s DNA, but male DNA was also present. The DNA from the panties was compared to Appellant's DNA, and Appellant could not be excluded as a contributor. Based on the signs that were present, the probability of selecting an unrelated person at random who could have been the DNA contributor was one in 324 for Caucasians, "one in 270 for blacks, and one in 574 for Hispanics." Appellant called an expert witness, Dr. Michael J. Spence, to controvert the DNA findings. Dr. Spence testified that McDonald's testing was not "bad science," but Dr. Spence had some concerns about the foreign alleles. Dr. Spence agreed, however, that the foreign alleles "are consistent" with Appellant and that Appellant could not be excluded as

3

a contributor of the DNA. Dr. Spence added that the foreign alleles would also be consistent with Appellant's son, who was two years old at the time of the offense.

B.J., M.A.M., and Appellant testified at trial. B.J., who was ten years old at the time of the trial and nine at the time of the offense, testified that she remembered the night that the police came to the house. Earlier that night, she had been on the "big couch" in the living room watching television. Appellant came home while B.J. was watching television. Appellant sat on the "little couch." Then, Appellant got down on his knees on the floor next to B.J., put his hand under the blanket, took off B.J.'s shorts and underwear, and touched her "middle spot" under her clothes. On a diagram of a female, B.J. marked the part of the female anatomy that she called her "middle spot." After Appellant touched B.J.'s middle spot, he kissed her on the mouth. Appellant smelled like beer. B.J. testified that M.A.M. came into the living room at some point and that, when M.A.M. left the room, Appellant got back down on the floor and touched B.J.'s middle spot again. B.J. testified that Appellant touched her with his hand. She said, "It felt like it went inside." Appellant then pulled B.J. onto the little couch and touched B.J.'s middle spot again. Appellant and B.J. were under a blanket. According to B.J., M.A.M. came into the living room again and told B.J. to get up. B.J. testified that she went back to the big couch, that Appellant touched her again, that M.A.M. came into the living room again, and that Appellant left the living room and asked M.A.M. to come with him. Instead, M.A.M. went to the "other room" and called Appellant's brother. B.J. said that she put her shorts and underwear back on when M.A.M. went to the other room.

M.A.M.'s testimony at trial differed from the statements she had made near the time of the offense. At the time of trial, M.A.M. was still married to Appellant and lived with him and their young son. M.A.M.'s other three children, including B.J., no longer lived with her. M.A.M. testified that, on the night she called the

4

police, her three oldest children had been asleep in the living room. Appellant had been out drinking with a friend that night, which angered M.A.M. At about 1:30 a.m., M.A.M. got up to check on her children and saw Appellant asleep on the love seat. B.J. and her sister were on the couch. M.A.M. said that she later observed B.J. "on top of [Appellant] asleep as well." M.A.M. testified that she reacted "because it just didn't look right." M.A.M. testified that she saw B.J.'s shorts on the floor but that she did not see B.J.'s panties on the floor. M.A.M. testified that she assumed B.J. still had her panties on.

When questioned about some of the variances between her testimony at trial and her statements to police officers and nurses, M.A.M. said that she did not recall making many of those statements. However, M.A.M. ultimately admitted that she told the first officer that arrived at her house that Appellant had touched B.J. in the private area. In a handwritten statement made by M.A.M. shortly after the offense, M.A.M. stated that B.J.'s underpants were off while she was lying on top of Appellant "with her butt on top of his pines [sic]" and that B.J. told her "that [Appellant] had her & put her on top of his . . . privets [sic] on her middle spot." M.A.M. testified at trial that she had lied about B.J.'s outcry, that M.A.M. had made up some of the things in her written statement, and that "[u]nderpants means shorts."

Rollins recounted the statements that M.A.M. and B.J. had made at the hospital. M.A.M.'s statements to Rollins were very similar to what M.A.M. had told Sergeant Counts, including the fact that M.A.M. saw "shorts and panties" on the floor. B.J. told Rollins that Appellant took her panties off when she was asleep, did "nasty stuff" to her, put his tongue inside her mouth when he kissed her on the lips, touched her privates with his hand, and "had her on top of him and had his private parts on hers."

Appellant denied touching B.J. inappropriately. Appellant testified that, when he came home from the bar, he sat on the love seat, took off his boots and shirt, and unbuttoned the top button of his pants. M.A.M.'s daughters were asleep on the couch, and B.J.'s feet were in her little sister's face. Appellant moved B.J. so that her feet would not be in her sister's face. Appellant said that B.J. woke up and came over to the love seat to sit next to Appellant, which was a normal thing for her to do. B.J. rested her head on Appellant's shoulder and hugged him, and they both fell asleep. M.A.M. came in and "just started raising hell" with Appellant. According to Appellant, he and M.A.M. had been having "problems" with their marriage, and M.A.M. was mad at Appellant before he left for the bar.

After reviewing the record and examining all of the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Appellant committed each of the essential elements of the offense of indecency with a child by contact as charged in this case. B.J. consistently stated that Appellant touched her middle spot, and the sexual assault nurse examiner observed redness in B.J.'s genital area. Appellant's sole issue on appeal is overruled.

We affirm the judgment of the trial court.

JIM R. WRIGHT
CHIEF JUSTICE

August 15, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.

6