

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00060-CR

_____


DAMEION DEON REDD, SR., Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 23-0059X



Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

A Harrison County jury found Dameion Deon Redd, Sr., guilty of one count of injury to a child and two counts of aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 22.02, 22.04 (Supp.). The jury found the State's punishment-enhancement allegation true, assessed a sentence of life imprisonment for the injury to a child, and assessed sentences of seventy years' imprisonment for each count of aggravated assault.

On appeal, Redd challenges the sufficiency of the evidence supporting the jury's findings of guilt. He also argues that the trial court erred by admitting, during the guilt/innocence phase, surveillance footage that the State failed to disclose before trial. Last, Redd argues that the trial court erred by admitting judgments of Redd's prior convictions during the punishment phase because the State did not disclose them before trial.

We find that legally sufficient evidence supports the jury's verdicts of guilty on all counts. We also find that Redd was not harmed by the admission of the surveillance footage or the judgments of conviction during punishment. As a result, we affirm the trial court's judgment.

I.     **Legally Sufficient Evidence Supports the Jury's Findings of Guilt**

The record establishes that a shooting occurred at the Decker Place Apartments at 2500 East End Boulevard South in Marshall, Texas. While Redd stipulated that Elizabeth Murray and her son, Ryan James, were shot and suffered serious bodily injury, Redd argued at trial and argues on appeal that the evidence is legally insufficient to establish that he was the shooter.[1]

---

[1]To protect the identity of the child, we use pseudonyms for the child and his mother. *See* TEX. R. APP. P. 9.10.

Redd also argues that, should we find the evidence legally sufficient to support the jury's finding that he was the shooter, the evidence is still insufficient to show that he knowingly or intentionally injured Ryan because nothing established that he intended the result. To evaluate those claims, we turn to the applicable standard of review.

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "It is not required

3

that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

Here, by a three-count indictment, the State alleged the following: (1) that Redd "intentionally, knowingly, [or] recklessly cause[d] bodily injury to [Elizabeth] by shooting" her while using or exhibiting "a deadly weapon, namely a firearm, during the commission of the assault"; (2) that Redd "intentionally, knowingly, [or] recklessly cause[d] bodily injury to [Ryan] by shooting" him while using or exhibiting "a deadly weapon, namely a firearm, during the

commission of the assault"; and (3) that Redd "intentionally [or] knowingly cause[d] serious bodily injury to [Ryan], a child 14 years of age or younger, by shooting [him] with a firearm."

### B.     The Evidence at Trial

Elondria Love testified that she and Redd were married for four and one-half years and that Redd had lived with her in the Decker Place Apartments for approximately one month. Love lived in apartment G-1, while Elizabeth and Ryan lived in apartment E-1, where the shooting occurred. Apartment E-1 and G-1 were located on the northwest corner of adjacent buildings. Testimony at trial established that buildings C, E, and G looked the same, while other buildings appeared different.

The shooting occurred in the first few minutes of November 28, 2022. Mack Butcher, a 9-1-1 dispatcher for the City of Marshall, testified that he received three phone calls informing him of the shooting at the Decker Place Apartments. In one of the calls, Roderick James informed Butcher that his girlfriend, Elizabeth, and son, Ryan, were bleeding after "something came through the window."

Tanner Garner, a patrol officer with the Marshall Police Department (MPD), testified that he was dispatched to Decker Place Apartments at 12:01 a.m. on November 28. Garner was approached in the parking lot as he arrived on the scene by Love who said, "[I]t was probably my ex." Garner's body camera showed that Love identified her "ex" as Redd and told Garner, "[H]e's been threatening me and everything. I've got divorce papers and all." She added that Redd had threatened to "come out [t]here and shoot [her] house up" five or ten minutes before the shooting.

5

John McCollum, an officer with the MPD, testified that he responded to Apartment E-1, where he found that Ryan, a five-year-old child, had sustained multiple gunshot wounds, and Elizabeth had been shot in the arm.[2] Elizabeth said that she was putting Ryan to bed in his room when she heard six or seven gunshots come through the window. Elizabeth said that she did not see the shooter and had "no clue" who it was. McCollum saw bullet holes coming through the bedroom window with "glass on the inside," demonstrating that the shooter was outside during the incident. While at the apartment complex, McCollum was informed of Love's report that Redd had been "making threats probably about five, ten minutes" before the shooting. When initially questioned about Redd, Elizabeth said she had "no clue" who he was.

Garner, who found six nine-millimeter casings on the outside of Ryan's bedroom window, testified that, based on the location of the casings, "the person who shot was standing right at the window." Even so, Edgar Pineda, another MPD officer, testified that no one saw the shooter.[3]

Pineda spoke with Love, who testified that Redd's threat was made by phone.[4] At trial, Love said that Redd had called her over "FaceTime video" and was supposed to be "bringing [her] kids some money for their birthdays," which she told Redd to leave with their father instead of coming over because she did not want to see him. Love testified that an argument ensued, that Love threatened her over FaceTime, and that she was about to call the police when she heard

---

[2]Elizabeth and Ryan described their injuries in detail for the jury. Additionally, Dr. Christin Ann Ho and Dr. Steve Megison testified about Ryan's extensive injuries.

[3]Pineda testified that a firearm is a deadly weapon.

[4]In Love's phone, Redd's phone number was listed as (903)578-----.

gunshots. Pineda also spoke with Love's boyfriend, Gamon Champion, who said that Redd had threatened him, that he was Redd's target, and that Redd told him he was going to "shoot [the] place up."

Robert Farnham, a sergeant with the MPD, testified that he went to Love's apartment and noted that it was "set up exactly the same" as Elizabeth's apartment. Farnham also noted that Love slept in the back bedroom of the apartment, just as Ryan slept in the back bedroom of Elizabeth's apartment. According to Farnham, Love was "really frantic" and afraid for her safety and the safety of her children living there.

Based on Love's and Champion's statements, the MPD began looking into Redd's whereabouts. According to Pineda, Redd lived in the Ward Plaza Apartments in Marshall, Texas, with his girlfriend, Shereka Newson. Mark Sedwick, a special agent and cellular analyst with the Federal Bureau of Investigation, testified that he could determine the approximate location of cellular devices based on their distance from certain service-provider towers. Sedwick opined that it took only five or six minutes to drive from Redd's Ward Plaza apartment to the Decker Place Apartments. Sedwick testified that his analysis of Redd's phone number and Verizon tower records showed that the phone was located at Redd's home at 11:01 p.m. on November 27. According to Sedwick, Redd's phone made three outgoing calls a 11:01, 11:01, and 11:03 on the night of November 27. Screenshots of Love's phone showed that she had received calls from Redd's phone on November 27. From "between 11:04 and 11:47, there was RTT data," which Sedwick described as background-signal measurements from a cell tower. Sedwick testified that there "was a gap in time from 11:47 to 12:01 where there was no data,"

7

followed by an "incoming call . . . that went to voicemail at 12:01, [and] another at 12:04."[5] Sedwick determined that Redd's cellphone was on the move and that a license plate reader picked up Redd's vehicle at 12:04 a.m. on November 28. Even so, Sedwick testified that he had no data that placed Redd's cell phone at the crime scene.

Farnham noted that there were several surveillance cameras that could show Redd's route of travel during the incident and obtained surveillance footage from Redd's apartment complex, Texas State Optical, Miracle Buds, All Seasons, and an E-Z Mart. Farnham testified that the Ward Plaza Apartments surveillance footage showed Redd leaving his apartment and driving off in a gray Chevrolet Venture van, which had a black stripe along the side and was registered to Newson.

According to Farnham, Redd left his apartment at 11:27 p.m. on November 27, which "correlate[d] with the shooting." The van was caught heading southbound by All Seasons's surveillance video at "11:35 p.m. headed towards Decker Place Apartments." Then, Texas State Optical, which was one block north of Decker Place Apartments, recorded the van traveling northbound "at 19 seconds after midnight" on November 28. The van was next captured by cameras owned by Miracle Buds and All Seasons at a time that, according to Farnham, showed that the van "was going quite fast" after midnight. During cross-examination, Farnham admitted that, because there was no video of Decker Place Apartments, he could not be "a hundred percent positive" that Redd was there.

---

[5]Love testified that she called Redd at 12:04 a.m. on November 28 to see where he was and if he had committed the shooting.

8

Farnham testified that the van never returned to Redd's apartment but that Redd was caught on camera walking back to his apartment at approximately 12:35 a.m. on November 28. Youndell Rudd testified that he was friends with Redd, who often parked the van in his backyard. Rudd said that the van was not there when he went to bed on November 27 but that it was in his backyard on November 28 when he woke up in the morning.

According to Farnham, the Ward Plaza Apartments surveillance footage showed that, after Redd walked back to and entered his apartment, he exited several minutes later with Newson after removing the dark shirt he was wearing. The couple got into Newson's silver Chrysler 300 and drove to an E-Z Mart, where Redd was spotted wearing an undershirt. Redd walked into the store but bought nothing. The couple then returned home.

Scott Smith, a lieutenant with the MPD, testified that he followed behind Redd and Newson the following morning in an unmarked vehicle as they left Ward Plaza Apartments in Newson's vehicle at about 7:15 a.m. and drove to Rudd's house. Once there, Smith spotted the Chevrolet Venture van on Rudd's property, and Redd was arrested when he attempted to retrieve the van.

At trial, Newson testified that she was asleep when Redd woke her up to see if she would go with him to the E-Z Mart. According to Newson, Redd appeared normal.

At trial, Love's credibility was called into question. Both Newson and Winfred Lee, who knew Love and Redd, testified that Redd had lived with Love for a couple of months. Lee said that Love contacted him "out of the blue" to give him information suggesting that she wanted to help Redd. According to Pineda, Love maintained that Redd had only lived with her for about

one month. Love also told Pineda that it was strange that the shooting happened in a different apartment because she was confident that Redd knew which apartment she lived in. Love admitted that she did not know whether Redd was the shooter. Ben Daily, a private investigator, testified that Love was previously convicted of giving a false report to police officers that she was robbed in exchange for thirty dollars. According to Daily, Love's story changed, and she altered important facts.

After hearing the evidence, the jury rendered verdicts of guilt.

### C.      Legally Sufficient Evidence Establishes that Redd Was the Shooter

"[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). Yet, juries are permitted to make rational inferences, which are "conclusion[s] reached by considering other facts and deducing a logical consequence from them," as opposed to "[s]peculation[, which] is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* at 16. In the absence of eyewitness testimony, "the State may prove the defendant's identity and criminal culpability by . . . circumstantial evidence, coupled with all reasonable inferences from that evidence." *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

As to his convictions for aggravated assault with a deadly weapon, Redd challenges only the element of identity. Redd argues that, in the absence of any eyewitness testimony or physical evidence placing Redd at the Decker Place Apartments during the shooting, only speculation supports the jury's finding that Redd was the shooter. In support, Redd cites to *Winfrey v. State*,

10

393 S.W.3d 763 (Tex. Crim. App. 2013). In that case, after a high school teacher was murdered in his home, nine people were questioned in connection with the murder. *Id.* at 764, 765. The defendant, who was sixteen at the time, was charged with capital murder and conspiracy to commit capital murder, and her father and brother were also arrested. *Id.* at 765, 767. Even so, DNA from blood drops, hair, fingerprints, and a bloody footprint found at the scene did not match the defendant or any of her family members. *Id.* at 765, 772. Moreover, the Texas Court of Criminal Appeals discussed the State's other evidence but ultimately concluded that (1) testimony that the defendant wanted money, believed that the victim had some in his home, and would be an "an easy lick" did not reveal any intent to kill the victim and was less incriminatory considering that no money was taken during the course of the murder; (2) testimony from the defendant's father's cellmate only incriminated the defendant's father, not the defendant, and contained information that was proven false; (3) testimony that the defendant shaved her pubic hair after learning that law enforcement found pubic hair at the scene was not significant in light of unchallenged testimony that she regularly shaved it; and (4) defendant's discussion of an alibi at the time of the murder did not indicate guilt since an alibi is a legitimate, non-statutory defense. *Id.* at 770–72. Also, the defendant's father was acquitted of murder, and the State elected not to indict him for conspiracy; the defendant's brother was also acquitted of murder and conspiracy to commit murder. *Id.* at 765 n.1. Accordingly, the Texas Court of Criminal Appeals reversed the defendant's convictions because no physical evidence connected the defendant to the crime scene and "[t]he only evidence that purported to directly connect [the defendant] to the crime scene was a '[dog] scent lineup,'" *id.* at 765, that "simply indicate[d] that

[the defendant] had had some contact with [the victim']s clothing, although the timing, circumstances, and degree of that contact cannot be determined," *id.* at 768.

This case is easily distinguishable from *Winfrey* because of the evidence establishing Redd's intent to commit a shooting in combination with evidence of his proximity to the scene during the time of the shooting. The evidence at trial demonstrated that Redd had called Love on November 27. According to Love, whom the jury could find credible, she had a conversation with Redd over FaceTime during the last hour of November 27 that became threatening. Both Love and Champion told officers that Redd had made a specific threat to "shoot up" Love's apartment five to ten minutes before the shooting. Surveillance footage shows that Redd left his apartment in the van at 11:27 p.m. on November 27, and, at 11:35 p.m., the van was seen heading southbound to Decker Place Apartments. Although the shooting occurred at Elizabeth's apartment, officer testimony showed that Love's apartment was "set up exactly the same" as Elizabeth's apartment and that Love's bedroom was in the back bedroom just as Ryan's bedroom was in the back bedroom. The shooter had walked to Ryan's bedroom window and stood outside as he fired several rounds.

Sedwick testified that there "was a gap in time from 11:47 to 12:01" when there was no activity on Redd's phone, during which the shooting occurred. However, there was activity both before and directly after the shooting. Calls to law enforcement prompted officers to be dispatched at 12:01 a.m. on November 28, but the shooter was nowhere to be seen. Texas State Optical, which was one block north of Decker Place Apartments, recorded the van traveling northbound "at 19 seconds after midnight" on November 28, and other surveillance cameras

12

show that the van was traveling "quite fast." The evidence established that Redd had parked the van at Rudd's house, walked home, reached his apartment at 12:35 a.m., and changed his shirt before going with Newson to the E-Z Mart. The following morning, Redd returned to Rudd's house to retrieve the van and was arrested.

From that evidence, any rational jury could believe that Redd had threatened Love and Champion with shooting Love's apartment and that, based on the surveillance footage placing him near the Decker Place Apartments at the time of the shooting, Redd had acted on his threat. It could have believed the State's theory that Redd had simply mistaken Elizabeth's apartment for Love's apartment and fled the shooting. The jury was also free to determine that Redd's actions in driving the van at a fast speed after midnight, dumping it in Rudd's backyard, and walking home indicated a consciousness of guilt. The jury could also find that Redd purposefully changed his shirt, woke Newsom, and traveled with her in a different vehicle to be spotted on E-Z Mart cameras without the van or the dark-colored shirt that he was wearing to establish some sort of false alibi. We find that those conclusions reached by the jury were logically made after considering the facts presented and the reasonable inferences arising from them. Viewing the totality of the evidence in the light most favorable to the jury's verdict, we conclude that legally sufficient evidence supports the jury's finding that Redd was the shooter.

### D.      Legally Sufficient Evidence Establishes Injury to a Child

Redd also argues that the evidence was insufficient to establish that Redd intentionally or knowingly[6] injured a child. A person commits injury to a child if he intentionally or knowingly

---

[6]The State's indictment only listed intent and knowledge as the mens rea for the offense.

13

causes by act "serious bodily injury" or "bodily injury" to a child. TEX. PENAL CODE ANN. § 22.04(a). "Injury to a child is a result-oriented offense [and] requir[es] a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citing *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)). As applicable here, a "person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b). "It is not enough for the State to prove that the defendant engaged in the alleged conduct with the requisite criminal intent; the State must prove that the defendant caused the result with the requisite criminal intent." *Estrella v. State*, 546 S.W.3d 789, 795 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (citing *Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994)).

Both Love and Champion testified that Redd had threatened their safety, and we have already concluded that the evidence is legally sufficient to establish that Redd desired to "shoot up" Love's apartment. By pointing a firearm in the direction of an occupied room and pulling the trigger, a rational jury could find that Redd was aware that his actions would result in injury or was reasonably certain to result in injury. *See Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012); *see also Earle v. State*, No. 06-20-00038-CR, 2020 WL 6749945, at *5 (Tex. App.—Texarkana Nov. 18, 2020, no pet.) (mem. op., not designated for publication). At trial, Redd stipulated to Ryan's serious bodily injuries.

Even so, Redd argues that nothing shows he intended to injure Ryan, a child. However, "[a] person is nevertheless criminally responsible for causing a result if the only difference

14

between what actually occurred and what he desired, contemplated, or risked is that . . . a different person . . . was injured." TEX. PENAL CODE ANN. § 6.04(b). As a result, when someone desires to injure an adult but injures a child instead, the doctrine of transferred intent applies. *Thompson v. State*, 236 S.W.3d 787, 800 (Tex. Crim. App. 2007); *Zubia v. State*, 998 S.W.2d 226, 227 (Tex. Crim. App. 1999) (per curiam) (rejecting defendant's argument that he could not be convicted of injury to a child because he intended to hurt the child's uncle and not the child); *Bravo v. State*, 471 S.W.3d 860, 868 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). Accordingly, we find that the evidence was legally sufficient to establish that Redd knowingly caused serious bodily injury to Ryan.

Because we reject Redd's legal sufficiency complaints, we overrule his first point of error.

## II.     The Trial Court Did Not Abuse Its Discretion by Admitting Surveillance Footage

Under Article 39.14, the State is required to "produce and permit the inspection" of "evidence material to any matter involved in the action." TEX. CODE CRIM. PROC. ANN. art. 39.14(a) (Supp.). In his second point of error, Redd argues that the trial court erred by admitting the surveillance footage from All Seasons, Miracle Buds, and E-Z Mart because the State allegedly did not disclose it or make it available for inspection before trial. When Redd objected to admission of the surveillance footage on those grounds, the State represented that all the surveillance videos were on the same "jump drive" that was copied by Redd's counsel.

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd)

15

(citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)). This standard of review also applies to alleged Article 39.14 violations. *State v. Heath*, 696 S.W.3d 677, 703 (Tex. Crim. App. 2024).

Although the State initially believed it had disclosed all the videos on the same "jump drive," it later clarified that it "thought everything that was transferred on the jump drive was given to [Redd]." The State continued, "It was an oversight. None of that was intentional." In any case, the "old concept of 'bad faith' no longer applie[s] to Article 39.14." *Id.* at 707. We assume, for the purposes of our analysis, that the videos were not disclosed in accordance with Article 39.14.

Even so, the Texas Court of Criminal Appeals has noted that a "trial court [i]s within its discretion to fashion a remedy it deem[s] appropriate." *Id.* at 708. Here, the trial court determined that an immediate recess was necessary to permit the defense to review the surveillance footage from All Seasons, Miracle Buds, and E-Z Mart. As a result, the trial was paused until the following morning, where Redd's counsel confirmed that he had reviewed the videos with Redd and did not seek additional time to prepare. Because the trial court fashioned

16

an appropriate remedy for the lack of timely disclosure, we cannot say that the trial court's decision to admit the videos was outside the zone of reasonable disagreement. *See id.*

Moreover, violations of Article 39.14 are subject to a harm analysis. *Watkins v. State*, 619 S.W.3d 265, 291 (Tex. Crim. App. 2021). Because the State's duties under Article 39.14 are statutory in nature, error "must be disregarded" unless it affects a defendant's "substantial rights." TEX. R. APP. P. 44.2(b). Here, Redd has not explained how he suffered substantial harm from the untimely disclosure of three surveillance videos, considering the videos from Texas State Optical and Redd's apartment complex show his comings and goings during the relevant time frame.

Also, "[a]n error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection." *Davis v. State*, 614 S.W.3d 223, 229 (Tex. App.— Texarkana 2020, no pet.) (second alteration in original) (quoting *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004)); *see Josey v. State*, 97 S.W.3d 687, 698 (Tex. App.—Texarkana 2003, no pet.) ("If the same or similar evidence is admitted without objection at another point during the trial, improper admission of the evidence will not constitute reversible error."). "This rule applies whether the same evidence was admitted 'without objection . . . before or after the complained-of ruling.'" *Davis*, 614 S.W.3d at 229 (quoting *Lane*, 151 S.W.3d at 193). The trial transcript shows that Farnham described each video in detail and that Redd failed to object to Farnham's testimony. As a result, we overrule Redd's second point of error.

17

### III. The Trial Court Did Not Abuse Its Discretion by Admitting Prior Judgments of Conviction at Punishment

In his last point of error, Redd argues that the trial court erred by admitting judgments of conviction for burglary of a habitation, evading arrest, possession of marihuana, displaying a fictitious vehicle registration, and two counts of misdemeanor family violence assault. Redd argues that the State failed to disclose the judgments of conviction under Article 39.14.

In *Watkins*, the Texas Court of Criminal Appeals found that "[t]he State erred by failing to produce [judgments of prior convictions] prior to trial in violation of Article 39.14(a)." *Watkins*, 619 S.W.3d at 291. Accordingly, the trial court had erred by admitting the exhibits over a proper objection. *Id.* at 290. Even so, the Texas Court of Criminal Appeals noted that the statutory error was subject to a non-constitutional harm analysis. *See id.*; *Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005). Under that standard, any error "that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

In conducting our harm analysis, we note that the State provided ample notice of its intent to use each conviction at trial. The State's notice alleged that Redd was convicted of each offense and provided the cause number, court of conviction, date of the judgment of conviction, and the sentence for each offense. Kaylee Wallace, a crime-scene investigator with the Harrison County Sheriff's Office, took Redd's fingerprints and examined his signature and testified that they matched the fingerprints or signature for the judgments of conviction introduced by the State. Without objection, Wallace testified about each judgment of conviction against Redd.

Because the jury heard Wallace's testimony that Redd was convicted of burglary of a habitation, evading arrest, possession of marihuana, displaying a fictitious license plate, and two counts of family violence assault, without any objection, error in the admission of the judgments of conviction was cured. *See Davis*, 614 S.W.3d at 229. As a result, we conclude that Redd did not suffer non-constitutional harm, and we overrule his last point of error.

## IV.    Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:    December 10, 2024
Date Decided:    January 8, 2025

Do Not Publish