

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00242-CR

GEORGE ANTHONY THURSTON          APPELLANT

V.

THE STATE OF TEXAS          STATE

----------

## FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1293819D

----------

## MEMORANDUM OPINION[1]

----------

Appellant George Anthony Thurston's murder and tampering-with-evidence cases were consolidated for trial. The jury acquitted Thurston of

---

[1]*See* Tex. R. App. P. 47.4.

murder but convicted him of tampering with evidence as charged in the indictment and assessed his punishment at eighty years' confinement.[2]

The second paragraph of the tampering-with-evidence indictment alleged that on or about May 30, 2012, knowing that an investigation or official proceeding was pending or in progress, Thurston altered, destroyed, or concealed a human corpse with intent to impair its verity or availability as evidence in said investigation or official proceeding. *See* Tex. Penal Code Ann. § 37.09(a)(1) (West 2011 & Supp. 2013). In part of his single issue, Thurston argues that the evidence is insufficient to support his conviction under this paragraph because there is no evidence that he knew an investigation was pending or in progress when he dumped the corpse at least two days before the police began investigating.[3] *See id.* He does not challenge that "pending" means "impending or about to take place." *See Lumpkin v. State*, 129 S.W.3d 659, 663 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see also Briscoe v. State*, No. 03-11-00014-CR, 2013 WL 4822878, at *7 (Tex. App.—Austin Aug.

---

[2]The indictment contained a repeat offender notice about a prior felony conviction, elevating the punishment range to that of a first-degree felony. *See* Tex. Penal Code Ann. § 12.32(a) (West 2011), § 12.42(b) (West 2011 & Supp. 2013); *see also id.* § 37.09(c) (West 2011 & Supp. 2013).

[3]The first paragraph alleged that on or about May 30, 2012, knowing a murder had been committed, Thurston altered, destroyed, or concealed a human corpse with intent to impair its verity or availability as evidence in any subsequent investigation of or official proceeding related to the murder. *See* Tex. Penal Code Ann. § 37.09(d)(1) (West 2011 & Supp. 2013). Thurston also attacks his conviction under this paragraph, but based on our resolution here, we do not reach his arguments related to it. *See* Tex. R. App. P. 47.1.

2

29, 2013, no pet.) (mem. op., not designated for publication) (finding evidence sufficient to support tampering conviction when appellant concealed the corpse and "was certainly aware that the victim had died and that an investigation into her disappearance was impending or about to take place").

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

Thurston testified that he shot and killed the deceased in self-defense but instead of calling the police, he decided to wait and tell his girlfriend first. Thurston said that he figured that he was in trouble, and the next day, he wrapped the body in a sleeping bag and a blue vinyl tarp and tied it with nylon rope so that nothing was exposed, "to keep the critters from getting [the deceased]." Thurston claimed that he did not take anything off of the body and that he never found the deceased's cell phone,[4] wallet, or identification. He threw in the trash "down the road" the bottle of rum from which the deceased had been drinking, and he moved the deceased's bicycle into the garage.

---

[4]An empty cell phone clip was found on the belt worn by the body. The deceased's cell phone records showed his last phone contact was on May 25, and Thurston's girlfriend said that she had given the deceased some money that day for some work he had done.

3

Thurston said that the wrapped body was too heavy for him to lift into his truck's bed by himself; he asked his girlfriend if she would help him lift it but did not tell her what it was, and she did not ask. Thurston said that she commented that there was an odor in the garage (where the shooting had occurred) and he "tried to play it off like maybe it was one of [the dead animals]" that they had found in the garage earlier in the year.[5]  Thurston said that they put a broken lawn chair and some plywood on top of the body to help cover the tarp and keep the wind from blowing everything out. Then he closed the tailgate and drove the truck out to the driveway, went back and splashed bleach around in the garage to "kind of deaden the odor," and closed the garage. Thurston said that he did not tell his girlfriend about the shooting until later that evening.[6]

Thurston said that he went into the garage the next morning, splashed ammonia around, and scattered some air fresheners because "it was starting to smell in there." He then drove the truck to the railroad tracks while his girlfriend

---

[5]Thurston's girlfriend testified that she told him on either Sunday or Monday that she smelled a dead animal and that Thurston told her he would find it and get rid of it. She testified that she helped Thurston load a large object rolled in a blue tarp into the truck on Tuesday, the day after Memorial Day, and that it smelled like something dead. She asked him, "Do I want to know what this is?" Thurston said no. She said that based on the size and smell, she assumed it contained a dead raccoon and some other stuff.

[6]Thurston's girlfriend said that he did not tell her about the shooting until after he saw a flyer about the deceased at a convenience store.

was getting ready to go to church.[7]  Thurston said, "All I did was wrap him up and took him out there and dropped him off."[8]

Thurston said that he picked the area where he left the body because he was not trying to hide it and knew that someone might see the bright blue tarp. He said that he did not want the body to be found at the house because he wanted to avoid having the media there.  Thurston stated that no one was around when he quickly dragged the body from the truck and that he did not particularly want anyone to see him.

Around a week after the shooting, Thurston disassembled the gun he had used and disposed of it in nine or ten parts in separate bags in different dumpsters, and he threw away most of the shell casings.  Thurston claimed that if he had been getting rid of evidence, he would have gotten all of the shell

---

[7]Thurston's girlfriend said that Thurston left in the truck during the preceding night after they loaded the object in the truck.

[8]A railroad conductor testified that on May 28, 2012, the train almost hit a white truck leaving the railroad crossing, that he noticed a "real bad" odor when traveling through the area for the next two days, and that on May 30, 2012, the rail workers saw a sleeping bag tied with rope with a foot hanging out; they reported this to a supervisor, who immediately drove out, saw the body, and called the police.  The jury saw photographs of the body in situ.  The deputy medical examiner testified that he examined the decomposing body, which had twelve gunshot wounds, on June 1; fingerprints were used to identify the deceased.  Police witnesses described the investigation in late May and into mid-June, including finding evidence in the garage where the shooting had occurred: the smell of decomposition, the air fresheners they saw strategically placed throughout the garage, three fired shell casings, and a large red stain that looked like blood.  Thurston's arrest warrant was issued on June 13, and he was arrested on June 20 near a white truck fitting the description the railroad workers had given.

5

casings and that he did not miss the three found by the police because he had not been looking for them.

When Thurston saw a flyer about the deceased in a nearby convenience store, he figured that the deceased's identity would connect the shooting to him but still took no action to report it. Around June 12, the police searched his girlfriend's house, where Thurston was no longer living. After the police issued Thurston's arrest warrant, his girlfriend told him that he needed to turn himself in. Thurston said that on June 20, he had stopped to put gas in the truck before turning himself in and was arrested at the gas station. Thurston stated that even if the police had never been able to identify the body or to link it to his girlfriend's home, he "would have probably told somebody." He stated, "I don't know when I'd have told them, but I'm sure I would have told them eventually because I still think they would have found him eventually."

In evaluating the witnesses' credibility and demeanor, *see* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Winfrey*, 393 S.W.3d at 768, the jury could have rationally found beyond a reasonable doubt that Thurston knew there would be an investigation after he killed the deceased and took actions to conceal the body with intent to impair its verity or availability as evidence in that investigation. Particularly, the jury could have relied on Thurston's testimony about his actions between May 25 and June 20, in addition to the extensive evidence regarding the corpse's discovery, the state of the corpse upon its discovery, and the subsequent investigation. *See* Tex. Penal Code Ann. § 37.09(a)(1); *Briscoe*,

6

2013 WL 4822878, at *7. Because the jury was authorized to convict Thurston based on either the first or second paragraph in the indictment and returned a general verdict of guilt, and because the evidence is sufficient to sustain his conviction under the second paragraph, we overrule this portion of his sole issue, do not reach the remainder of his sole issue challenging the first paragraph, *see Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003), and affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and GARDNER, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  July 17, 2014