In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00253-CR**
_____

**QUINCY RAY PILLETTE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B-150032-R**

**MEMORANDUM OPINION**

Appellant Quincy Ray Pillette (Pillette or Appellant) was indicted by an Orange County grand jury for possession of a controlled substance, a second degree felony. *See* Tex. Health & Safety Code Ann. § 481.115(a), (d) (West 2010). The indictment alleged that on or about October 1, 2014, Pillette "intentionally and knowingly possess[ed] a controlled substance, to wit: Phencyclidine, in an amount by aggregate weight . . . of four grams or more but less than 200 grams[.]" The State sought to enhance Pillette's punishment for a prior felony conviction. Pillette

1

entered a plea of not guilty and pleaded "true" to the enhancement. The jury found Pillette guilty as charged in the indictment and assessed punishment at confinement in the Texas Department of Criminal Justice for a term of twelve years. The trial court entered a Judgment of Conviction by Jury consistent with the jury verdict and certified that Pillette has the right of appeal. Pillette timely filed a written notice of appeal. In a single issue, Pillette challenges the legal and factual sufficiency of the evidence to support his conviction. We affirm.

EVIDENCE AT TRIAL

Witnesses for the State

Amber Levette (Levette) and Courtney Janice (Janice), both employees at a convenience store, testified they were working the night shift on October 1, 2014. At trial, both Levette and Janice identified Pillette as a man who had come into the store that night. According to Levette, Pillette smelled strange that night, like "embalming fluid," and she recognized the smell because she had known people that smoked cigarettes that had been dipped in "embalming fluid."[1] Levette explained that Pillette asked her the same question repeatedly, and then "sat in the parking lot for like a good ten minutes, and he kept turning the blinkers on and off

---

[1] Later testimony revealed that street names for PCP or phencyclidine include "dip," "wet," and "embalming fluid," and although PCP is referred to as "embalming fluid," it is actually a different chemical than formaldehyde. Witnesses also testified that "strack" refers to a container used to carry PCP.

2

in the car and the windshield wipers on and off." Levette suggested that Janice call the police because "[s]omething just [didn't] feel right."

Janice testified that Pillette asked them where he was and he stated he thought he was in Louisiana, and after he "stumbled around the store[,]" he then stayed in the car in the parking lot for "quite awhile[,]" and then came back in to the store to buy matches. According to Janice, Pillette returned to his car in the parking lot for twenty or thirty minutes, Pillette's car lights flashed on and off, and the windshield wipers came on, although she explained that it was not raining at the time. According to Janice, she could "faintly smell" some odor she could not identify wherever Pillette walked, and she thought he was intoxicated. Janice called the sheriff's department because she "knew something wasn't right."

Sergeant Charles Williams (Williams), Corporal Andrew Hollier (Hollier), and Deputy Dustin Bock (Bock) testified that they were law enforcement officers who were called to the scene that night. According to Williams, it was "sprinkling off and on" that night. Williams explained that he found Pillette sitting in the driver's seat of a red car, that Pillette was unsure of his whereabouts, and "[the] longer we spoke, the more it was determined that he appeared to be intoxicated[,]" however Williams did not notice any smell on Pillette. According to Williams, the officers found drugs in less than five minutes once they began to search the

vehicle. Williams testified that he observed Hollier retrieve from Pillette's vehicle a cigarette that was wet and stained, that appeared to have been dipped in something, as well as a small Scope bottle filled with a liquid that did not appear to him to be Scope. Williams told Hollier to place the items back where Hollier had found them so they could take photographs of where the items had been found in the vehicle.

Williams also testified that Pillette was intoxicated that night, and he agreed that Pillette was in possession of PCP. Williams agreed that being under the influence of a substance was an indicator that a person is in possession of a substance. And, Williams also explained that, in his experience, persons intoxicated on PCP have memory problems.

Hollier testified that Pillette's eyes were glassy and "it was obvious that he was . . . impaired. He didn't know how to go home[,]" and he did not know where he was. Hollier explained that when searching Pillette's vehicle, they located "a small Scope clear bottle[]" and "a cigarette that looked like it was -- had gotten wet somehow." He testified that the Scope bottle was between the driver's door and the driver's seat, and the cigarette was under the front part of the driver seat. According to Hollier, Pillette had access to both the Scope bottle and the cigarette, and both items were "in view from standing outside the car." Photographs of the

4

car, the Scope bottle, and the cigarette were admitted into evidence. Hollier testified that a photograph of the Scope bottle showed tobacco in the bottom of the bottle.

Bock testified that he could smell alcohol on Pillette's breath and that Pillette was "sweating profusely[.]" Initially Pillette told Bock that he had not consumed any alcohol, but later he told Bock he had consumed a couple of beers. Bock testified that, in his professional career, he had dealt with people on drugs, including people on PCP, and after questioning Pillette, Pillette admitted he had taken PCP earlier in the night. When Bock saw the Scope bottle, he "[i]mmediately [] suspected that it was going to be P.C.P." because

> [o]ne, . . . he'd already admitted to doing P.C.P. earlier in the night; and, two, because it was in a Scope bottle and it was a clear liquid substance. My personal experience with Scope is that it's going to be either like a greenish color or a blue color, not clear.

Bock testified that he arrested Pillette for public intoxication and possession of a controlled substance and that he believed Pillette was "in possession" based on Pillette's apparent intoxication at the time and because Pillette had access to the Scope bottle and wet cigarette that Bock believed had been dipped in PCP. On cross-examination, Bock was asked whether Pillette knew the drugs were in the car:

5

[Defense attorney]: And did Mr. Pillette ever say anything to you that he knew that those drugs were in the car?

[Bock]: He eventually said that he was looking for it earlier.

[Defense attorney]: Looking for what earlier?

[Bock]: Looking for the substance inside the car.

[Defense attorney]: What did he say?

[Bock]: His words were -- to me were that "I was trying to find that earlier."

[Defense attorney]: Trying to find what?

[Bock]: The P.C.P. I'm assuming the P.C.P. He never said directly "the P.C.P." He just said, "I was trying to find that earlier."

Bock also testified that Francheska Broussard was the owner of the vehicle Pillette drove that night.

Rebekah Sweetenham (Sweetenham), a forensic scientist with the Jefferson County Regional Crime Lab, testified that the cigarette obtained from Pillette's car had the odor of phencyclidine. She testified that her analysis showed 15.497 net grams of phencyclidine in liquid in the Scope bottle and 0.742 net grams of phencyclidine in the cigarette. Sweetenham's analytic report was admitted into evidence.

Detective Chad Hogan (Hogan) with the Orange County Sheriff's Office testified that, as custodian of evidence, he handles all evidence processing. He

6

explained that, in such capacity, he received State's Exhibits 9, 9a, 10, and 10a into evidence and transported them to the crime lab for processing. These exhibits were admitted into evidence, and they included "Scope bottle containing P.C.P.[,]" "dip cigarette," and two brown paper evidence bags. Hogan testified that he also received into evidence a statement written by Pillette, which was admitted into evidence. Hogan read the following portion from Pillette's written statement:[2]

> I relapsed and took one bar pill and totally forgot what was going on. I have experienced [sic] with drugs and need help. I only want to do the right thing. I made a mistake, and I'm willing to accept the consequences. I won't do anything else bad. Please show me some lenience.

Witnesses for the Defense

Francheska Broussard (Broussard) testified that Pillette had visited her at her apartment around midnight on October 1, 2014, and that she "could smell -- the P.C.P. as he talked to [her][,]" and he appeared intoxicated and not "in his right mind[.]" According to Broussard, she and Pillette talked and watched television, and he was at her apartment for thirty to forty-five minutes.

Broussard explained that, when she could not find her car keys the next morning, she thought that Pillette had taken her car because he was the last person at her apartment. Broussard denied giving Pillette permission to use her car, and

---

[2] Later testimony revealed that a "bar" is a street name for Xanax.

she denied seeing the drugs found with Pillette or the Scope bottle containing PCP. Broussard explained that she had to "take a loss" because she had to pay to get her car out of impound, and she denied the loss was "drug money loss[.]"

Nehemiah Martin (Martin) testified that he lived at the same apartment complex as Broussard, and Anthony Peterson (Peterson) testified that he was a friend of Pillette's and that he saw Pillette at Martin's apartment on October 1, 2014. Martin and Peterson explained that Pillette told them he had just gotten out of jail. They also testified that they heard Broussard telling Pillette that Broussard was angry and wanted Pillette to pay her. Both Martin and Peterson testified they heard Broussard demanding that Pillette pay to get her car out of impound and to pay her for her "strack."

Pillette's older sister Tiffany Harris (Harris) testified that Broussard told her that Pillette had taken Broussard's car and "he got caught with her drugs in her car and she wanted $500." According to Harris, Broussard wanted $200 to get her car out of impound and $300 "for her 'dip.'" Pillette's younger sister Cecilia Henderson also testified that she heard Broussard telling Pillette he should pay to get Broussard's car out of impound and for the drugs the police found in the car when Pillette was arrested. Pillette's mother also testified that she heard Broussard

8

and Pillette arguing about her car being impounded and about something else that she "assume[d] [] was the dip or whatever."

Pillette testified that he had been with Broussard on September 30, 2014, and that he took a Xanax that Broussard gave him. According to Pillette, Broussard asked if he wanted to take a ride with her, and that when they got to her car, Broussard pulled a Scope bottle from her pocket as well as a cigarette and asked if he wanted to "try some[.]" Pillette agreed to smoke with her, and he testified that he had smoked PCP "a few times before[.]" Pillette explained that Broussard dipped the cigarette into the clear liquid in the Scope bottle and they rode around in her car for about forty minutes while they were smoking. Pillette did not recall what Broussard did with the Scope bottle after she dipped the cigarette into the bottle, and Broussard stated, "I never saw that bottle again."

According to Pillette, when he and Broussard returned to Broussard's apartment, Pillette knew he was intoxicated and he felt thirsty. He testified that he asked Broussard if he could use her car to go to the store and that Broussard "gave [him] consent to get the keys[.]" He denied seeing the Scope bottle when he got into her car. He remembered going to the convenience store, but he did not remember asking the "whole thing about . . . the Beaumont and Louisiana thing[.]"

9

Pillette recalled Broussard telling him he owed her for the drugs that were in her car. He admitted he had smoked PCP that night and that he was intoxicated, but he denied knowing that the drugs were in the car. He testified as follows:

> Q. How could you not be in possession of that P.C.P., Mr. Pillette, when you're actually using that same P.C.P. on that same day?
>
> A. Because at the time when the P.C.P. was found, I knew nothing about the P.C.P. being in the car.

Although he testified that he knew Broussard had the bottle, that he saw her dip a cigarette into the bottle while they were in her car, and that they smoked PCP together while they drove around in her car, he denied knowing the drugs were in Broussard's car. According to Pillette,

> I never knew what she was going to do with it. It was hers, and I felt like she would keep it on her person. I didn't know whether she would leave it in the car or keep it with her. I didn't know what she was going to do with it.

### ISSUE ON APPEAL

In a single issue, Appellant challenges whether the evidence was legally and factually sufficient to support his conviction. Although Appellant admits to having been intoxicated, he argues that the drugs the officers found were not his and he did not know the drugs were in the vehicle. In particular, he argues that the fact that one of the police officers moved the drugs from the exact location where the

10

drugs were found before photographing the drugs "makes it impossible to say that [Pillette] would have seen the drugs or should have seen the drugs."

The State argues that the evidence is legally and factually sufficient, and that the evidence supports a more-than-fortuitous affirmative link between Appellant and the drugs found because at the time in question Pillette was in exclusive possession of the vehicle in which the police found the PCP, the store clerks and officers testified that Pillette was intoxicated, Pillette acted and smelled like someone who had been smoking PCP, and Pillette admitted to having used PCP that night.

STANDARD OF REVIEW

When an appellant challenges the sufficiency of the evidence supporting a conviction in a criminal case, appellate courts consider all of the evidence in a light most favorable to the verdict and decide, after reviewing the evidence in that light, whether a rational trier of fact could have found the appellant guilty of the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). In reviewing sufficiency challenges, we are required to give the jury's findings and its conclusions deference, as it was the jury's responsibility to fairly resolve all conflicts in the testimony, to weigh the evidence, and to draw

11

reasonable inferences from the basic facts to resolve whether the defendant is guilty of violating the criminal provision that is at issue at trial. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 808-09 (Tex. Crim. App. 2015) (citing *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13). "'When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.'" *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016) (quoting *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014)). The jury, as the judge of the facts and credibility of the evidence, may choose to believe or not believe the witnesses, or any portion of their testimony, despite contradictory evidence. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (citing *Esquivel v. State*, 506 S.W.2d 613 (Tex. Crim. App. 1974)).

POSSESSION OF A CONTROLLED SUBSTANCE

A person commits the offense of possession of a controlled substance if he knowingly or intentionally possesses the controlled substance in the prescribed

12

amount, by aggregate weight, including adulterants or dilutants. *See* Tex. Health & Safety Code Ann. §§ 481.102 (West 2010), 481.115. To prove possession, the State must prove that (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband. *Evans v. State*, 202 S.W.3d 158, 161 (Tex. Crim. App. 2006). The State does not have to prove that the defendant had sole or exclusive possession of the drugs. *See Cude v. State*, 716 S.W.2d 46, 47 (Tex. Crim. App. 1986). However, when the defendant does not have exclusive possession of the place where the contraband is found, then independent facts and circumstances must link him to the drugs. *Poindexter v. State*, 153 S.W.3d 402, 405-13 (Tex. Crim. App. 2005) (citing and quoting *Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981)). Regardless of whether the evidence is direct or circumstantial, it must establish that the defendant's connection with the drug was more than fortuitous. *Evans*, 202 S.W.3d at 161.

"Mere presence at the location where drugs are found is thus insufficient, by itself, to establish actual care, custody, or control of those drugs." *Id.* at 162. However, presence or proximity, when combined with other evidence, either direct or circumstantial, can be sufficient to establish that element beyond a reasonable doubt. *Id.* It is not the number of links that is dispositive, but rather the logical

13

force of all of the evidence, direct and circumstantial. *Id.* Texas courts have set forth a non-exclusive list of possible links that may be sufficient, either singly or in combination, to establish a person's possession of contraband:

> 1) whether the drugs were in plain view; 2) whether the appellant was present when the drugs were found; 3) whether the appellant owned or had the right to possess the place where the drugs were found; 4) whether the appellant was closely related to other persons in joint possession of the drugs or who owned the premises; 5) whether the drugs were conveniently accessible to the appellant; 6) whether the drugs were in close proximity to the appellant; 7) whether drug paraphernalia was in plain view or found near the appellant; 8) whether the place where the drugs were found was enclosed; 9) the amount of drugs found; and 10) whether the appellant possessed weapons.

*Bahr v. State*, 295 S.W.3d 701, 708 (Tex. App. —Amarillo 2009, pet. ref'd) (citing *Evans*, 202 S.W.3d at 162 n.12). Whether the "physical condition of the accused indicated recent consumption of the contraband found" may also be relevant. *Whitworth v. State*, 808 S.W.2d 566, 569 (Tex. App.—Austin 1991, pet. ref'd) (citing *McGaskey v. State*, 451 S.W.2d 486, 487 (Tex. Crim. App. 1970)).

Convenient access to the contraband is an accepted factor that may affirmatively link an accused to contraband found in a vehicle. *Robinson v. State*, 174 S.W.3d 320, 326 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (citing *Deshong*, 625 S.W.2d at 329). "The term 'conveniently accessible' means that the contraband must be within the close vicinity of the accused and easily accessible

14

while in the vehicle so as to suggest that the accused had knowledge of the contraband and exercised control over it." *Id.* (citing *Rhyne v. State*, 620 S.W.2d 599, 601 (Tex. Crim. App. 1981); *Deshong*, 625 S.W.2d at 329).

SUFFICIENCY ANALYSIS

In this case, the officers testified that the Scope bottle and wet cigarette were found in the car when Pillette was arrested. Levette testified that Pillette smelled like "embalming fluid," and both Levette and Janice testified that Pillette appeared intoxicated. The evidence established that Pillette had access to both the Scope bottle and the cigarette. Although Williams and Hollier admitted to having moved the Scope bottle and cigarette before photographing them, they also testified that they found both items near the driver's seat in the car in which they found Pillette, and Hollier testified that both items were "in view from standing outside the car." The officers also testified that Pillette appeared intoxicated, and Pillette himself admitted he had smoked PCP that day. Defense witnesses testified that Broussard, the owner of the vehicle which Pillette was driving, confronted Pillette about repaying her for drugs that were in her car when Pillette was arrested. Although Pillette denied knowing that any drugs were in Broussard's car when he took the car, he admitted he saw Broussard dip a cigarette into the liquid in the Scope bottle

15

and that he had smoked PCP with Broussard in her car earlier that evening or the previous day.

As the sole judge of the credibility and weight of the evidence, the jury could have reasonably believed that Pillette exercised control, management, or care over the drugs found with him and that he knew the substance was contraband. *See Evans*, 202 S.W.3d at 161. Based on direct and circumstantial evidence at trial, the jury could have found sufficient affirmative links between Pillette and the drugs based on evidence. The drugs were in plain view, the drugs were discovered in the car Pillette was driving, the drugs were conveniently accessible and in close proximity to Pillette, Pillette admitted that he had observed Broussard dip a cigarette into the Scope bottle and that he smoked PCP with Broussard in her car earlier that evening or the previous day, and Pillette admitted to being intoxicated on PCP at the time of his arrest. *See Bahr*, 295 S.W.3d at 708 (citing *Evans*, 202 S.W.3d at 162 n.12); *Whitworth*, 808 S.W.2d at 569 (citing *McGaskey*, 451 S.W.2d at 487). Accordingly, considering the evidence in a light most favorable to the verdict, we conclude that the evidence was legally and factually sufficient to support Pillette's conviction, and we overrule Pillette's issue on appeal.

We affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on July 14, 2016
Opinion Delivered September 21, 2016
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.

17