**Affirm and Opinion Filed December 28, 2022**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

Nos. 05-21-00605-CR

05-21-00606-CR

05-21-00607-CR

**TYRONE DEWAYNE SOMMERS, SR., Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 15th Judicial District Court**
**Grayson County, Texas**
**Trial Court Cause No. 071533, 070802, 070803**

## MEMORANDUM OPINION

Before Justices Molberg, Partida-Kipness, and Carlyle
Opinion by Justice Partida-Kipness

Appellant Tyrone Dewayne Sommers, Sr. appeals his convictions for

conspiracy to commit murder-enhanced, tampering with evidence-enhanced, and

unlawful possession of a firearm by a felon-enhanced.[1] In three appellate issues,

Sommers contends (1-2) the evidence was legally insufficient to support any of the

---

[1] Sommers was indicted for conspiracy to commit the murder of Robert Allen. *See* TEX. PENAL CODE §§ 15.02, 19.02(b). Sommers was also charged with possessing a firearm and tampering with evidence related to the murder. *See id*. §§ 37.09(a)(1), 46.04(a)(2).[1] Sommers pleaded not guilty to the charges and not true to the enhancement paragraphs of the indictments.

convictions and (3) the trial court abused its discretion by not granting a new trial based on newly discovered evidence. We affirm.

## BACKGROUND

### I.     Trial

On October 31, 2017, after realizing her husband, Robert,[2] had not returned home from work, Stacy Allen went to Allen's Plumbing to check on him. Upon her arrival, Stacy found the back door ajar and Robert laying, unresponsive, in the hallway. As she called 911, Stacy realized he had been shot and was dead.

Family and friends told law enforcement Tim Barnum most likely was involved in Robert's murder. Barnum was the ex-boyfriend of Amanda Allen, Robert and Stacy's daughter, and the father of their granddaughter. Amanda testified she and Barnum dated from 2010-2015 and had one child from the relationship. She admitted she had purchased a firearm for Barnum in 2013. Amanda and Barnum had a tumultuous relationship, which ended when Barnum was charged with assaulting Amanda in 2015. Amanda stated that Barnum threatened to kill her and her family if she did not drop the charges and Barnum blamed Robert for her filing charges against him. She allowed Barnum to visit the child until late 2015 when he withheld their daughter from her for a period of ten days before returning her. After that,

---

[2] Multiple members of the Allen family testified at trial, so we will identify them by their first names for the sake of clarity.

Robert did not want Barnum to see the child again and a family court entered a no contact, no visitation order against Barnum.

Different individuals who worked at Allen's Plumbing testified they knew Barnum threatened Robert and his family, that Robert had a gun at the business in response to those threats, and there were precautions taken at the business because of those threats. The employees also testified Robert frequently stayed late at work, and always had the back door of the business locked after hours. One of the last people thought to see Robert, Roger Phillips, stated he left Allen's Plumbing on October 31 around 8:15 p.m. Amanda testified that on October 31, 2017, she was trick-or-treating with her children earlier in the evening, and after taking a friend home, she drove by Allen's Plumbing at 10:08 p.m. and noticed the back door was open. She stated she was going to call and check up on Robert, but forgot and fell asleep as soon as she got home. She awoke to her sister telling her Robert had been killed.

Texas Ranger Brad Oliver assisted the Denison Police Department on the case. He testified he was called out on the night of the murder, and when he arrived at the crime scene, nothing from Allen's Plumbing appeared missing and there were no signs of forced entry. Initially Barnum was the only suspect in the offense but they got a break in the case in early 2018 when an anonymous caller mentioned Sommers for the first time. That anonymous caller was Barnum's sister-in-law, Toni

Barnum.[3] After that call, law enforcement received information from the Durant, Oklahoma police department concerning evidence from an August 2016 case in which Barnum shot his father, Herman Barnum, with Sommers present. Sommers took Herman to a hospital in Durant, and the men told law enforcement they were shot near the casinos. Bullets recovered from Herman's vehicle matched bullets found at the scene of Robert's murder. The parties stipulated that Barnum shot Herman, and the same gun was used in the murder of Robert Allen.

In March 2018, law enforcement interviewed Barnum's girlfriend, Haley Lummus, and searched their shared home. During that search, two black masks were recovered: a regular ski mask, a black mask from the movie "Scream." Law enforcement also interviewed Sommers who told them Barnum was his second cousin, and Barnum let Sommers stay in a house he owned in Sherman in exchange for "fixing it up." Sommers stated on October 31, 2017, he was in Sherman drinking and "getting high," and not in Denison. He denied ever threatening people for Barnum or being at a plumbing store in Denison. Sommers admitted, however, that he was present when Barnum shot Herman in 2016, and he took Herman to Durant.

After interviewing the people Sommers said he was with on October 31, 2017, law enforcement arrested him for murder. Those individuals told police Sommers was with them earlier in the day but he left their group in the early evening when

---

[3] Multiple members of the Barnum family also testified at trial, so we will identify them by their first names as well.

they went trick-or-treating. Law enforcement also collected cell phone records that placed Sommers in Denison near Allen's Plumbing on October 31. During a second interview, Sommers told law enforcement his only involvement in Robert's murder was the dispose of the murder weapon in the Denison dam area. Sommers told police he purchased a red Cadillac from Barnum on November 1, 2017, the same day Barnum gave him the gun to dispose of.

Denison Police Detective John Watt testified he conducted the second interview of Sommers where Sommers told him Barnum called him to "get rid of a gun." Sommers said it was a .357 chrome revolver. When confronted with cell phone records placing him in Denison on the evening of October 31, 2017, Sommers said Barnum picked him up at a nearby trailer park where he was with a friend, they "rolled" by Allen's Plumbing, and Barnum had black clothes and a mask. Sommers said about an hour later, Barnum messaged him saying, "I tripped the F out," but Sommers did not respond. The following day, Barnum asked him to dispose of the gun. The murder weapon was never located.

Lummus testified she moved in with Barnum around March 2017 and never heard him complain about the Allens. She knew Barnum had a gun because she saw him with it. On October 31, 2017, she went trick-or-treating in Sherman with her children and returned to Denison around 8:45 p.m. When she returned, Barnum pulled into the driveway behind her and she saw a "bald, black guy" with him. According to Lummus, Barnum also had the Scream mask, dark clothes, and tennis

shoes with duct tape on them. She stated she "knew to not ask questions of Barnum." Later that evening, Barnum returned home and told her to go with him to pick up his cousin near the car wash in Denison. She said they picked up the same "bald black guy" she had seen earlier. Lummus also recalled going to Sonic on their way home and Barnum asking for a receipt, which she stated was "unusual." On cross-examination, Lummus stated she suspected Sommers based on information from Toni, and Toni gave her the idea the house in Sherman and Cadillac were given to Sommers for his "participation."

Toni Barnum explained that she was the anonymous caller in 2018. She testified that she was on the phone with Barnum's then-girlfriend when Barnum shot Herman in 2016, and she heard three gunshots over the phone. In December 2017, Lummus told her for eight months prior to Robert's murder, Sommers and Barnum went on "dry runs" for the crime. Lummus stated she would go with them at the beginning but then stopped. On October 31, Lummus told Toni she saw the gun and it was "thrown into her lap" after Barnum and her picked up Sommers at the car wash. Lummus also said she saw two masks: a black one Sommers wore and the Scream one Barnum wore.

Herman testified he knew Barnum had issues with Robert over visitation with his child. He told the jury Barnum had previously asked him to kill Robert and he repeatedly refused, which caused Barnum to get upset. In 2016, Barnum texted Herman and called him a "coward" for not wanting to kill Robert. Herman and

Sommers went over to talk to Barnum. Herman said when he got out of his car, Barnum began shooting at him and he was hit in the lower part of his back. Herman had Sommers drive him to Durant because he did not want the "cops" called. Herman said he talked to Sommers about Robert, but Sommers said he was not going to get involved. A few days after Robert's murder, Herman saw Sommers in Sherman at Barnum's house with the red Cadillac. Sommers told Herman he had "helped Barnum out" and shot Robert. According to Herman, Sommers stated Barnum and Lummus took him to Allen's Plumbing, Robert heard a noise, and when he stood up, Sommers "busted him" two times. Herman also testified he had been charged with aggravated perjury for lying to the grand jury during the investigation of this case. He admitted the aggravated perjury charge was being dismissed in exchange for his testimony at trial.

Forensic scientists Rebekah Lloyd from the Texas Department of Public Safety tested the masks for gunshot residue (GSR). She testified the Scream mask had no GSR and the ski mask had "1 indicative particle of GSR." She explained that particle could be from something other than just shooting a gun and there was no way to determine how long it had been there. Phillip Duong conducted firearms analysis on the bullets recovered in 2016 and at Allen's Plumbing and determined all three bullets were shot with the same gun.

Andrew Smith testified for the State. Smith had been incarcerated with both Barnum and Sommers prior to their trials. Smith explained Barnum started speaking

to him about Robert's murder after a few months being housed together. Barnum told him he wanted Robert dead because he would not let him see his child and that his cousin, Sommers, killed Robert. In exchange, Barnum said he gave Sommers the house and two ounces of methamphetamine. Barnum told Smith he picked up Sommers and dropped him off near Allen's Plumbing, and then met him later at the car wash. Sommers had the murder weapon and was supposed to get rid of it, but Barnum did not believe he did. Later, when Smith was housed with Sommers, Sommers told him Barnum picked him up from the trailer park in Denison, dropped him near Allen's Plumbing, and he walked up to the back door. Sommers told Smith he knocked on the door, and when Robert opened it, he "smoked him." After the shooting, Sommers said he "hauled ass to the car wash" where Barnum picked him up with a "white girl." Sommers explained that Barnum had given him the gun to use, which was the same one Barnum shot Herman with, and Sommers threw it in the lake. On cross-examination, Smith admitted he received a reduced sentence for the offenses he was incarcerated for in exchange for his testimony, but he had to cooperate in order for the reduction to occur. He also stated he became friends with Barnum and Barnum wanted his help to "create" a story that implicated Sommers, instead of him.

Andrew Alexander also testified about an event he witnessed on October 31, 2017. While out walking his dog, a man approached Alexander and asked to borrow his phone. Alexander agreed and the man called Barnum's number, as determined

by cell phone records collected. Alexander did not know the man and could not identify him in court. Alexander said the man returned his phone and continued walking down the street in the direction of the car wash.

After the State rested, Toni Barnum was recalled by the defense. She testified that after Herman told her Sommers was living in Sherman at Barnum's house and driving the red Cadillac, she spoke to him herself where he admitted his involvement.

A jury found Sommers guilty of all three charges, found the enhancements true, and sentenced him to 75 years' imprisonment on the conspiracy charge, 40 years' imprisonment for being a felon possessing a firearm, and 25 years' imprisonment for tampering with evidence.

## II.    Motion for New Trial

Sommers filed a motion for new trial upon learning Amanda and Smith were friends prior to their testimony at trial. At a hearing, Amanda testified she met Smith sometime in 2018 and was friends with his sister. She explained they met through mutual friends and would spend time together in social settings. She stated that later they communicated more frequently on the phone, which continued after Smith was incarcerated. Amanda said the only thing they discussed about the trial was when they would be there to testify, but never what they were testifying about. Amanda agreed there were times in the communications that they spoke of a sexual relationship in the future and possibly living together, but at the time of the hearing,

neither of those had occurred. She denied they were trying to keep their relationship secret and stated there were times they were "live" on Facebook. Amanda agreed she never disclosed to prosecutors that she knew Smith or was speaking to him.

Smith testified he believed he came to know Amanda in late 2020, upon being released from jail, and he initially messaged her on Facebook. Smith agreed he initially gave his statement to law enforcement about Robert's murder on December 10, 2019. He stated he did not spend time with Amanda until sometime in 2021, because she was friends with his sister. Smith said their relationship was not romantic, but was "flirty" and they had used drugs together. Smith explained they spoke often after he was incarcerated and did have plans to have a sexual relationship, although it never happened. He said they never talked about the case or trial because Amanda said "she couldn't talk about it . . . we never had any discussion about details about anything related to the actual murder or the trial." Smith also stated that the relationship "had no bearing on my participation with the prosecution."

The prosecutor testified he was unaware of any contact between Amanda and Smith until "sometime after the Sommers trial." He explained Smith had been moved for his safety since it would come to light he was cooperating through discovery. He was not sure if the facilities Smith was moved to had the capabilities to record phone calls in the jail. He stated this came to light because Amanda contacted one of their victim coordinators due to threats she received and the victim

–10–

coordinator noticed three conversations coming out of the jail between Amanda and Smith. He notified defense counsel and provided transcripts of the conversations. The trial court denied the motion for new trial. This appeal followed.

## ANALYSIS

Sommers raises three issues on appeal. First, he states that the evidence is legally insufficient to show an agreement between Sommers and Barnum to commit the murder of Robert. Next, Sommers argues the evidence was insufficient to corroborate the "extrajudicial confession" of Sommers for the tampering with evidence and felon in possession of a firearm charges. Last, Sommers alleges the trial court abused its discretion in failing to grant his motion for new trial based on evidence that Amanda and Smith had a "personal relationship."

## I. Sufficiency of the Evidence

Sommers asserts the evidence does not show an agreement between himself and Barnum to commit Robert's murder. He also argues under the *corpus delicti* rule that the evidence was insufficient to support his convictions for tampering and felon in possession of a firearm.

We review a sufficiency challenge by considering all of the evidence in the light most favorable to the verdict and determine, whether, based on the evidence and reasonable inferences therefrom, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013);

*Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We defer to the fact finder's credibility and weight determinations because the fact finder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). The fact finder can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

We measure whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liabilities, and adequately describes the particular offense for which the defendant was tried." *Id.*; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013). The "law as authorized by the indictment" includes the statutory elements of

the offense and those elements "as modified by the indictment." *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

A hypothetically correct charge for conspiracy to commit murder states:

(a)   A person commits criminal conspiracy, if with intent that murder be committed:

    (1)   he agrees with one or more persons that they or one or more of them engage in conduct that would constitute murder; and

    (2)   he or one or more of them performs an overt act in pursuance of the agreement.

(b)   An agreement constituting a conspiracy may be inferred from the acts of the parties.

TEX. PENAL CODE § 15.02. A person commits murder if he "intentionally or knowingly causes the death of an individual." *Id*. § 19.02(b)(1). A hypothetically correct charge for unlawful possession of a firearm by a felon states:

(a)   A person who has been convicted of a felony commits an offense if he possesses a firearm:

    (1)   after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony; or

    (2)   after the period described in Subsection (1), at any location other than the premises at which the person lives.

*Id*. § 46.04(a). A hypothetically correct charge for tampering with physical evidence means:

(a)   A person commits an offense, if knowing that an investigation or official proceeding is pending or in progress, he:

–13–

>    (1)    alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation.

*Id*. § 37.09(a)(1).

### A.    Conspiracy to Commit Murder

Under a hypothetically correct jury charge, the State must prove Sommers agreed with one or more persons to engage in conduct that would constitute murder and one of more of the parties performed an overt act towards that goal. *Id*. § 15.02. "Since an agreement between parties to act together in common design can seldom be proved by words, the State often must rely on the actions of parties, shown by direct or circumstantial evidence, to establish an understanding or common design to commit the offense." *Ervin v. State*, 333 S.W.3d 187, 201 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). A defendant's intent may be inferred from his words, acts, and conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (relying on circumstantial evidence); *Gittens v. State*, 560 S.W.3d 725, 735 (Tex. App.—San Antonio 2018, pet ref'd).

Here, the State presented testimony from multiple witnesses to show Sommers and Barnum planned and executed the murder of Robert. Members of the Allen and Barnum families testified Barnum had a motive for killing Robert. Herman said Barnum had repeatedly asked him to kill Robert for him. Herman and Toni both testified Sommers told them Barnum gave him the house in Sherman and the red

–14–

Cadillac in exchange for killing Robert. Smith explained how he came to know both Barnum and Sommers while they were incarcerated in the same jail. He testified both Barnum and Sommers told him, on separate occasions, that Sommers killed Robert for Barnum. The people Sommers had been with earlier in the day on October 31, 2017, stated Sommers left when they went trick-or-treating. Sommers's phone records put him in the area of Allen's Plumbing on October 31, 2017, and he admitted he and Barnum drove by Allen's Plumbing that night and had black masks in the car. Lummus stated she and Barnum picked up a "bald black man" from the car wash on October 31. Toni also testified Lummus told her Barnum and Sommers did "dry runs" in preparation for killing Robert, they picked up Sommers from the car wash, and the gun ended up in her lap that evening.

Sommers correctly states there was overwhelming evidence that Barnum wanted to kill Robert. He maintains, however, there was no physical evidence or eyewitnesses to tie him to the scene, and the statements from multiple witnesses alone are insufficient to support the conviction. We disagree. The jury heard the testimony, including the benefits certain witnesses would gain from their testimony, and found support to convict Sommers. Circumstantial evidence alone can be sufficient to support a conviction. *Hooper*, 214 S.W.3d at 13. The jury can believe all, some, or none of the evidence presented and we defer to the weight the jury gave to the testimony it heard. *See Winfrey*, 393 S.W.3d at 768; *Chambers*, 805 S.W.2d at 461. Here, the jury heard the evidence and chose to believe there was an agreement

between Sommers and Barnum to kill Robert. The jury also chose to believe one or both of them committed an overt act to further that goal. The evidence is sufficient to support the jury's verdict for conspiracy to commit murder. We overrule Sommers's first issue.

### B.        Tampering with Evidence and Felon in Possession of a Firearm

In his second issue, Sommers contends the evidence is insufficient because the convictions for tampering with evidence and felon in possession of a firearm were based on his extrajudicial confession. Sommers relies on the *corpus delicti* rule to argue this sufficiency point.

The *corpus delicti* rule is a judicial rule of evidentiary sufficiency "affecting cases in which there is an extrajudicial confession." *Shumway v. State*, —S.W.3d—, —, 2022 WL 301737, at \*5 (Tex. Crim. App. Feb. 2, 2022) (quoting *Miller v. State*, 457 S.W.3d 919, 925 (Tex. Crim. App. 2015)). It requires "[w]hen a conviction is based on a defendant's extrajudicial confession, that confession does not constitute legally sufficient evidence of guilt without corroborating evidence independent of that confession showing that the essential nature of the offense was committed." *Id*. (quoting *Miranda v. State*, 620 S.W.3d 923, 928 (Tex. Crim. App. 2021)). The *corpus delicti* rule essentially adds an extra requirement to our traditional *Jackson* legal sufficiency analysis for cases involving extrajudicial confessions. *Id*.

Under the *corpus delicti* rule, "the corroborating evidence does not need to independently prove the crime, but must simply make the occurrence of the crime

–16–

more probable than it would be without the evidence." *Id*. The *corpus delicti* of a particular crime is simply "the fact that the crime in question has been committed by someone." *Id*. (quoting *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993)). It does not require proof that the specific defendant committed the criminal act, just that the crime itself occurred. *Id*.

Sommers gave extrajudicial statements admitting he disposed of the gun for Barnum. He told law enforcement that, on November 1, 2017, he traveled to Denison to retrieve the gun from Barnum and then disposed of it near the Denison dam. Sommers also accompanied law enforcement to the dam area and showed them where he threw the gun into the water. Sommers made these statements in early 2018. Although a law enforcement dive team searched the area, the gun was never recovered.

Sommers's statements were not the only evidence regarding Sommers disposing of the gun. Smith also testified that Barnum told him Sommers was supposed to dispose of the gun used, but had doubts Sommers actually did so. Sommers also told Smith he used a gun to commit the murder and then "threw it in the lake." The jury was entitled to believe Smith's testimony to corroborate Sommers's previous statements to law enforcement.

Because *corpus delicti* only requires that the evidence show a crime was committed, and not specifically by who, the statements Smith attributes to Barnum and Sommers are sufficient to support the convictions for tampering with evidence

–17–

and felon in possession of a firearm. *See Shumway*, 2022 WL 301737, at *5. We overrule Sommers's second issue.

## II.     Motion for New Trial

In his third issue, Sommers argues the trial court abused its discretion by denying his motion for new trial.

Sommers's motion for new trial is based on a claim of newly discovered evidence. In his motion, and at a later hearing, Sommers developed evidence to show a prior unknown relationship between Amanda and Smith.

"A new trial shall be granted to an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. art. 40.001. To obtain relief under this provision, the defendant must satisfy a four-prong test: (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to his lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017); *see Jasso v. State*, 05-19-00117-CR, 05-19-00118-CR, 05-19-00119-CR, 2022 WL 2187452, at *2 (Tex. App.—Dallas June 17, 2022, pet. ref'd) (mem. op.).

At the new trial hearing, Amanda and Smith admitted to meeting each other after Robert's murder and staying in contact throughout the trial. They both stated

–18–

they spent time together in social settings prior to Smith's incarceration, and continued to talk by phone after he was in custody. Although they did not tell anyone they were communicating with each other, they each told the trial court they did not discuss any aspects of the case or any testimony given in the trial. The State's prosecutor testified he was unaware of a relationship between Amanda and Smith until an employee of the district attorney's office brought it to his attention. He notified defense counsel when he learned of the relationship between Amanda and Smith.

Sommers established evidence of the first two prongs: the evidence was unknown or unavailable to him at the time of trial and his failure to discover or obtain the new evidence was not due to his lack of due diligence. *See Arizmendi*, 519 S.W.3d at 149. However, the evidence presented does not establish the remaining elements. Amanda and Smith both stated they did not discuss their testimony or trial other than what time they would be at the courthouse to testify. Evidence of their relationship would, thus, serve no purpose other than to impeach Amanda and Smith's credibility. *See id.* (stating a defendant must show the evidence is not merely cumulative, corroborative, collateral, or impeaching). Moreover, Sommers failed to show the evidence would probably bring about a different result in a new trial. *See id.* We conclude the trial court did not abuse its discretion by denying Sommers's motion for new trial. We overrule Sommers's third issue.

## CONCLUSION

Under this record, we conclude the evidence was sufficient to support Sommers's convictions for conspiracy to commit murder, tampering with evidence, and felon in possession of a firearm. We also conclude the trial court did not abuse its discretion in denying Sommers's motion for new trial. We overrule his three issues and affirm the judgment of the trial court.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b).
210605F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

TYRONE DEWAYNE SOMMERS,
SR., Appellant

No. 05-21-00605-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 15th Judicial
District Court, Grayson County,
Texas
Trial Court Cause No. 071533.
Opinion delivered by Justice Partida-
Kipness. Justices Molberg and
Carlyle participating.


Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered this 28th day of December 2022.



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

TYRONE DEWAYNE SOMMERS, SR., Appellant

No. 05-21-00606-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 15th Judicial District Court, Grayson County, Texas
Trial Court Cause No. 071533.
Opinion delivered by Justice Partida-Kipness. Justices Molberg and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 28th day of December 2022.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TYRONE DEWAYNE SOMMERS, SR., Appellant

No. 05-21-00607-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 15th Judicial District Court, Grayson County, Texas
Trial Court Cause No. 071533.
Opinion delivered by Justice Partida-Kipness. Justices Molberg and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 28th day of December 2022.