COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JUSTIN ALDAVA, | § | No. 08-22-00118-CR |
| Appellant, | § | Appeal from the |
| v. | § | 42nd District Court |
| THE STATE OF TEXAS, | § | of Taylor County, Texas |
| Appellee. | § | (TC# 29852-A) |

## MEMORANDUM OPINION

## BACKGROUND

Appellant challenges his conviction of robbery.[1] TEX. PENAL CODE ANN. § 29.02. In a single issue, Appellant claims the evidence is legally insufficient to support the jury's rejection of his defense of necessity. We affirm.

### *Factual Background*

Van Robinson (Robinson) was beaten and robbed by members of a motorcycle club. At the time of the incident, Robinson was disabled from a prior motorcycle accident in which he broke his back, hip, pelvis, and shattered his leg. Although Robinson was not able to ride as much, he described riding as one of the few freedoms he still had following his accident.

---

[1] This case was transferred from our sister court in Taylor County, Texas pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Eleventh Court of Appeals to the extent it might conflict with our own. *See* TEX. R. APP. P. 41.3.

On the evening in question, Robinson was riding his motorcycle on his way to meet his fiancé. He was wearing his vest, or what riders call, a "cut," indicating his membership of the Kinfolk Motorcycle Club. Inside his vest he had a .9 mm pistol and his cellphone. As he traveled north, he passed a building that was being used as a clubhouse for the Bandido Motorcycle Club. After he passed the building, he saw three motorcycle headlights approach him from behind. The three motorcycles continued to follow him, and Robinson concluded they must be members of the Bandidos, who at that time, were traveling fast and gaining on him. The men were later identified as Appellant, Jesse Trevino, and Danny Machado.[2]

Appellant and the other men continued to pursue him, and Robinson continued to flee. At one point, Robinson ran a red light in hopes of losing the men. While still attempting to flee on his motorcycle, Appellant lifted his foot while he was driving and kicked Robinson in his back and hip, trying to knock him off his motorcycle. Appellant and the other two men eventually trapped Robinson, leaving him with nowhere to go. Robinson came to a complete stop, got off his motorcycle, drew his pistol from his vest, and held it down to his side. The men began to argue and yell at one another, and ultimately, Robinson was grabbed by his vest, pulled off his bike, dragged across the parking lot and beaten by Appellant and the other men. Appellant and the other men took Robinson's vest and left him in the parking lot. After Appellant and the men left the scene, an eyewitness called 911. Reported stolen during the robbery was Robinson's vest, cellphone, and handgun.

### Procedural Background

Appellant was charged in a four-count indictment in which he was alleged to have committed aggravated robbery (Count I), engaging in organized criminal activity (Count II),

---

[2] Jesse Trevino and Danny Machado are not parties to this appeal.

robbery (Count III), and aggravated assault (Count IV). The jury found Appellant guilty of robbery and not guilty of the remaining counts. The trial court assessed punishment at ten years confinement in the Texas Department of Criminal Justice, Institutional Division. This appeal followed.

## DISCUSSION

In a single issue, Appellant challenges the legal sufficiency of the evidence because according to Appellant, the evidence in support of his necessity defense is overwhelming, if not, conclusive. We disagree.

### *Standard of Review*

When a defendant challenges the legal sufficiency of the evidence to support rejection of a defense such as necessity, the question is not "'whether the State presented evidence which refuted appellant's self-defense [evidence].'" *Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The question becomes, for the reviewing court, whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and additionally, would have found against the defendant on the necessity defense beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914.

Once a defendant has introduced some evidence supporting a defense, the State continues to bear the burden to prove its case beyond a reasonable doubt, but it does not have a burden to introduce evidence to disprove the defense. *Zuliani*, 97 S.W.3d at 594. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). When conducting an evidentiary

sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

The defense of necessity is a defense to prosecution under Section 2.03 of the Texas Penal Code. *See* TEX. PENAL CODE ANN. §§ 2.03, 9.22. A defendant asserting a Section 2.03 defense has the burden of producing some evidence to support his claim of the defense. *Zuliani,* 97 S.W.3d at 594; *Smith v. State,* 355 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Once the defendant produces that evidence, the State bears the ultimate burden of persuasion to disprove the raised defense. *Zuliani,* 97 S.W.3d at 594. The burden of persuasion does not require that the State produce evidence disproving the defense; rather, it requires that the State prove its case beyond a reasonable doubt. *See id.; Saxton,* 804 S.W.2d at 913. If the jury finds the defendant guilty, then it implicitly rejects his defensive theory. *Zuliani,* 97 S.W.3d at 594; *Saxton,* 804 S.W.2d at 914. So, in analyzing the sufficiency of the evidence in this context, we look not to whether the State presented evidence which refuted appellant's necessity defense testimony; rather, we determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the charged offense beyond a reasonable doubt and also would have found against appellant on the defense of necessity beyond a reasonable doubt. *See Saxton,* 804 S.W.2d at 914 (citing the well-established sufficiency-of-the-evidence standard as outlined in *Jackson v. Virginia,* 443 U.S. 307 (1979)); *see also Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).

### *Applicable Law*

A person commits the offense of robbery if, in the course of committing theft as defined in Chapter 31, and with intent to obtain and maintain control of the property, he: (1) intentionally,

knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death.[3] TEX. PENAL CODE ANN. § 29.02.

The Texas Court of Criminal Appeals has interpreted the necessity defense to embrace the confession and avoidance doctrine. *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010). In other words, the accused must admit he committed the offense, then claim necessity as a justification. *Pennington v. State*, 54 S.W.3d 852, 856 (Tex. App.—Fort Worth 2001, pet. ref'd). An actor's conduct is justified by necessity if: (1) he reasonably believes the conduct is immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly and reasonably outweigh the harm sought to be prevented by the law proscribing the conduct; and (3) a legislative purpose to exclude the claimed justification does not otherwise plainly appear. TEX. PENAL CODE ANN. § 9.22. Elements one and two must be satisfied by evidence, while element three presents a question of law. *Pennington*, 54 S.W.3d at 856.

An accused is required to present evidence that he reasonably believed a specific harm was imminent. *Id.* at 857; TEX. PENAL CODE ANN. § 9.22(1). Harm is imminent when there is an emergency, and it is "immediately necessary" to avoid that harm. *Pennington*, 54 S.W.3d at 857 (quoting *Jackson v. State*, 50 S.W.3d 579, 594–95 (Tex. App.—Fort Worth 2001, pet. ref'd). Simply put, there is no time to consider the law because a split-second decision is required. *Id.* In addition, an accused must also present evidence that he reasonably believed the criminal conduct was immediately necessary to avoid imminent harm. *Id.*; TEX. PENAL CODE ANN. § 9.22(1). Reasonable belief means a belief that would be held by an ordinary and prudent person in the same

---

[3] A person commits the offense of theft if he unlawfully appropriates property with intent to deprive the owner of property. TEX. PENAL CODE ANN. § 31.03(a).

circumstances as the actor. *Pennington*, 54 S.W.3d at 857; TEX. PENAL CODE ANN. § 1.07(a)(42). A determination of the reasonableness of an accused's belief is a question of fact to be viewed from the accused's standpoint at the time he acted. *Id.*

*Analysis*

Robinson rode his motorcycle past the Bandido clubhouse while wearing his "cut" of another club. Soon after, he saw three motorcycle headlights approach him from behind. Robinson concluded it must be the Bandidos coming after him. The three motorcycle riders, one of them being Appellant, ultimately caught up to Robinson. While still after Robinson, Appellant lifted his foot while he was driving and kicked Robinson in his back and hip, trying to knock him off his motorcycle. Robinson managed to pass a bystander vehicle, then ran a red light in an attempt to escape the men. The men pursued and Robinson described, "they [were] basically right on top of me." As Robinson tried to cut through a parking lot, one of the men cut in front of him, while the other two men closed him off from behind him; Robinson was trapped. Robinson came to a complete stop, got off his motorcycle, drew his pistol from his vest, and held it down to his side. Robinson described, in that moment,

> I was in fear of my life. They've now chased me all this way. There's three of them and one of me. And I'm crippled. I know I'm broken. I can't even get on my motorcycle the right way. I have to drag my foot across my seat to actually get onto my motorcycle.

Robinson dismounted his bike and used it as a barrier between him and the men. Then, they all started screaming at one another, exchanging curse words. According to Robinson,

> Eventually one of them tells me to get on my bike and leave. I told them to leave. I was told that wasn't going to happen, that more of them were going to be coming to finish the job. So I thought maybe I might be able to leave, maybe they will let me go. So I proceeded to put my stuff -- my gun back in my vest, button my vest up, and try to get on my bike. And once I finally was able to get on it and stand it up, they then attacked me.

6

One of the men grabbed Robinson, dragged him across the parking lot to the other two men, and all three proceeded to stomp on him, punch him, and kick him in the back, head, and face. The men got Robinson's vest off him and proceeded to leave with it. As the men were leaving, Appellant ran Robinson over with his motorcycle.

Photographs of Robinson's injuries were admitted into evidence and published to the jury. Surveillance videos of the parking lot—where the incident occurred—were also admitted and published to the jury. At trial, Robinson identified all three men. Robinson testified he never attempted to attack any of the men during the incident.

According to Appellant, him and the other two men were traveling together to a bar when they saw a motorcycle in front of them (Robinson). Appellant testified once they attempted to pass Robinson, Robinson swerved into Appellant, which is why Appellant kicked at him to avoid them both from wrecking. Soon after, Robinson again tried to collide with Appellant, so Appellant stuck his foot out again to prevent a collision. Then, according to Appellant, Robinson allegedly cut the men off and forced them into the parking lot, then pulled out his pistol. Appellant testified Robinson pointed his pistol at all three men, then directly at Trevino, and at one point Robinson allegedly said, "this is for Dusty." A fight between Trevino and Robinson over the pistol ensued, and according to Appellant, he and Machado sat and watched, and he did not intervene for about ten to fifteen seconds.

Appellant claimed he saw Robinson reach in his vest as if "he had another gun on him or something." According to Appellant, they took Robinson's vest because they did not know what he had inside. After they got Robinson's vest off him, the men ran to their bikes and Trevino threw Robinson's vest towards a tree. As the men were leaving, Appellant claimed Robinson "just stood

7

right up and he started charging" at his bike, grabbed a hold of Appellant's hand, then the clutch "fell out of" Appellant's hands, which resulted in his bike striking Robinson.

Additionally, the jury heard testimony from Larry Esparza, who witnessed the incident and called 911. Esparza testified he saw four men in a huddle, and when he passed them, he saw a man attempting to leave on his motorcycle and the other men "bum-rushed" him and started beating him. According to Esparza, when the three men rushed the fourth man, the fourth man was either pushed off his motorcycle or fell off, then the three men "beat him up pretty good" and kicked him.

Agent Jerod Daniel of the Abilene Police Department also testified at trial. He was the responding officer on the night in question and when he arrived on scene, Robinson's shirt was ripped off and he was hanging from his handlebars with blood flowing from his forehead, nose, elbow, and hands.

Officer Jerimiah Torrez of the Abilene Police Department testified as a criminal gang expert. Officer Torrez testified to his experience as an officer in the gang unit, and his specialized training in criminal gang intelligence and outlaw motorcycle gangs. Officer Torrez testified the Texas Bandidos and the Abilene chapters are recognized in the Texas Gang database as a street gang. The Texas Department of Public Safety (DPS) has classified the Bandidos as a criminal street gang and the U.S. Department of Justice has classified them as a criminal organization. Officer Torrez confirmed that Appellant is recognized in the DPS database as a registered member of the Texas Bandidos, specifically, the north side Gunslinger chapter. At the time of trial, Appellant was the Sergeant at Arms, who is the individual that enforces the rules for the club. However, at the time of the incident, Appellant was a "Prospect" for the Bandidos, which means

8

he was a member in training, attempting to prove himself worthy to receive a patch. Appellant confirmed this at trial.

According to Officer Torrez, Appellant became a full member of the Bandidos (or, "fully patched") five months after Robinson was beaten and robbed. Officer Torrez explained that all patches found on a Bandido vest have importance and noted Appellant had an "Expect No Mercy" patch, which meant he had shed blood on behalf of the Bandidos in defense of the club and had "done what [he] needed to do in reference to violence towards somebody else to protect the Bandido name."

The area around the clubhouse was described by Officer Torrez as a "Bandido stronghold." Officer Torrez explained the area was avoided and only Bandido cuts and Bandido support club cuts were allowed into the area. When asked whether anyone went through that area without fear, Officer Torrez responded "they were terrified to go through there if they were in a different cut . . . that area is considered their stronghold. So you didn't come to that area in anything other than red and gold [Bandido colors] because it would be considered disrespectful." He explained that if anyone challenged or disrespected the Bandidos, the Bandidos "would follow them to wherever they want, and in typical Bandido style, three on one."

According to Appellant, assaulting Robinson was necessary to take Robinson's pistol, then afterwards, Robinson's vest, which Appellant believed could have contained a second gun. In other words, Appellant's conduct was necessary to avoid being shot. However, before any assault occurred, Robinson put his pistol inside his vest and mounted his motorcycle to leave, but was attacked by Appellant and the other two men. According to Appellant, assaulting Robinson after they took his pistol from him was further necessary to take away his vest because Appellant was unaware whether Robinson had a second gun hidden inside. The jury, however, heard this

9

testimony and implicitly rejected it by way of its guilty verdict. *See Saxton*, 804 S.W.2d at 914 ("A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory.").

The jury heard the testimony of Esparza, who witnessed the incident in the parking lot, and Agent Daniel, who testified as to the physical state of Robinson when he arrived on scene, and Officer Torrez, who testified as an expert and explained that Robinson's act of riding in Bandido territory while wearing the cut of another motorcycle club was considered insulting and disrespectful. The jury heard extensive testimony of how violent and territorial the Bandidos are known to be, and Appellant became "fully patched" five months after Robinson was beaten and robbed.

The jury heard testimony before any assault or theft occurred, Robinson had put his pistol inside his vest and attempted to end the altercation by leaving, but was attacked and assaulted; Appellant and the other two men had already taken Robinson's pistol away, and Robinson was defenseless, on the ground, while Appellant proceeded to stomp on him, punch him, and kick him in the back, head, and face.

Turning to the case at hand, after viewing all the evidence in the light most favorable to the prosecution, we find a rational trier of fact would have found the essential elements of the charged offense beyond a reasonable doubt and also would have found against Appellant on the defense of necessity beyond a reasonable doubt. Viewing the evidence from Appellant's standpoint at the time he assaulted and robbed Robinson, we cannot conclude, as a matter of law, that an ordinary and prudent person in the same circumstances would believe harm was imminent and robbing Robinson was immediately necessary to avoid imminent harm. *See* TEX. PENAL CODE ANN. § 9.22.

Issue One is overruled.

## CONCLUSION

For these reasons, we affirm.

YVONNE T. RODRIGUEZ, Chief Justice

June 8, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.

(Do Not Publish)